CAUSE NO. 05-04-03592-CV

| | | |
|---|---|---|
| TODD PETERS; MALVIN D. PETERS; | § | IN THE DISTRICT COURT OF |
| LYNETTE S. PETERS, AND | § | |
| THE M & L FAMILY LIMITED | § | |
| PARTNERSHIP | § | |
| | § | |
| VS. | § | MONTGOMERY COUNTY, TEXAS |
| | § | |
| PHILLIPE MULACEK; | § | |
| PETROLEUM INDEPENDENT AND | § | |
| EXPLORATION CORPORATION; | § | |
| INTEROIL CORPORATION; | § | |
| EP INTEROIL, LTD.; | § | |
| S.P. INTEROIL, L.D.C.; | § | |
| P.I.E. GROUP, LLC; | § | |
| NIKISKI PARTNERS, LTD.; | § | |
| AND COMMODITIES TRADING | § | |
| INTERNATIONAL CORPORATION | § | 284TH JUDICIAL DISTRICT |

## PLAINTIFFS' TENTH AMENDED
## PETITION AND JURY DEMAND

Plaintiffs are:  Todd Peters; Lloyd Tisdale and LTPT, LLC; Jack Farris; Ken Walker;

Mohammad Shafiq; Howell Wiesner; Chandrakant Patel; Rasik & Pushpa Patel; A. Dearl Dotson and

the A. Dearl Dotson Family LP; John Crawford and Crawford Oil Company; Benjamin Hughes, Judith

Hughes and B&J Hughes Ventures, Ltd.; David Graumlich; Fred and Joan Brown; Molibari International

and its managing member, Gordon Glade; Paul Scott Hughes and Cathy Hughes; Don Edd Wiesner; and

James Jordan Group (James Jordan). (As to all Plaintiffs except Todd Peters, this petition, to the extent

necessary to cause their effective joinder as Plaintiffs, is intended, alternatively, as petition in

intervention.) Plaintiffs file this petition against the following defendants: Phillipe Mulacek;

Petroleum Independent and Exploration Corporation; Petroleum Independent & Exploration, LLC;

InterOil Corporation; EP InterOil, Ltd.; S.P. InterOil, L.D.C.; P.I.E. Group, LLC; Nikiski Partners,

Ltd.; and Commodities Trading International Corporation.  Plaintiffs respectfully show as follows:

## I.  Discovery Plan

1.      Plaintiffs intend that discovery be conducted under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

## II.  Plaintiffs

2.      Plaintiff Todd Peters is a resident of Montgomery County, Texas.

3.      Plaintiff LTPT, LLC is a Texas limited liability company with its principal place of business in Montgomery County, Texas.  Plaintiff Lloyd Tisdale is the managing member of LTPT, LLC.

4.      Plaintiff Jack Farris is a resident of Jefferson County, Texas

5.      Plaintiff Ken Walker is a resident of Montgomery County, Texas.

6.      Plaintiff Mohammad Shafiq is a resident of Montgomery County, Texas.

7.      Plaintiff Howell Wiesner is a resident of Montgomery County, Texas.

8.      Plaintiff Chandrakant Patel is a resident of Harris County, Texas.

9.      Plaintiffs Rasik & Pushpa Patel are residents of the State of New Jersey.

10.     Plaintiff A. Dearl Dotson is a resident of Bexar County, Texas.  The A. Dearl Dotson Family LP is his family limited partnership, and it has its principal place of business in Bexar County, Texas.

11.     Plaintiff John Crawford is a resident of the State of Missouri.  Crawford Oil Company has its principal place of business in Missouri.

12.     Plaintiffs Benjamin and Judith Hughes are residents of Montgomery County, Texas. Plaintiff B&J Hughes Ventures, Ltd. is their family partnership, and it has its principal place of business in Montgomery County, Texas.

46447

13.    Plaintiff David Graumlich is a resident of Montgomery County, Texas.

14.    Plaintiffs Fred and Joan Brown are residents of Lubbock County, Texas.

15.    Plaintiff Molibari International is a business entity with its principal place of business in Nebraska.  Gordon Glade, its managing member, is a resident of Nebraska.

16.    Plaintiffs Paul Scott Hughes and Cathy Hughes are residents of Harris County, Texas.

17.    Don Edd Wiesner is a resident of Montgomery County, Texas.

18.    Plaintiff James Jordan Group is a business entity.  James Jordan, is authorized representative, is a resident of Texas.

19.    Collectively, Plaintiffs represent 46.1% of the original interest in Nikiski Partners, Ltd.

### III. Defendants

20.    Defendant Phillipe Mulacek ("Mulacek") has already appeared in this case.  He may be served with this amended petition through his counsel of record.

21.    Defendant Petroleum Independent and Exploration Corporation ("P.I.E. Corp.") has already appeared in this case.  It may served with this amended petition through its counsel of record.  Defendant Petroleum Independent & Exploration, LLC ("P.I.E. LLC") is believed to be the successor to P.I. E. Corp. and, pursuant to Articles of Conversion effective as of June 1, 2008, to have succeeded to all of its assets and liabilities.  P.I.E. LLC may be served with process by serving its registered agent, Dale Dossey, 25025 I-45 N., Suite 400, The Woodlands, Texas 77380.  Each reference in this petition to P.I.E. Corp. includes its successor, P.I.E. LLC.

22.    Defendant InterOil Corporation ("InterOil") has already appeared in this case.  It may be served with this amended petition through its counsel of record.

23.     Defendant EP InterOil, Ltd. ("EP InterOil") has already appeared in this case. It may be served with this amended petition through its counsel of record.

24.     Defendant S.P. InterOil, L.D.C. ("S.P. InterOil") has already appeared in this case. It may be served with this amended petition through its counsel of record.

25.     Defendant P.I.E. Group, LLC ("P.I.E. Group") has already appeared in this case. It may be served with this amended petition through its counsel of record.

26.     Defendant Nikiski Partners, Ltd. ("Nikiski Partners") was formerly known as P.I.E. Refinery, Ltd. It has already appeared in this case and may be served with this amended petition through its counsel of record.

27.     Defendant Commodities Trading International Corporation ("CTI") is a corporation organized under the laws of the Bahamas. It engages in business in Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas. Accordingly, the Texas Secretary of State is deemed, under Section 17.044(b) of the Texas Civil Practice and Remedies Code, to be CTI's agent for service of process. The Texas Secretary of State shall forward a copy of the process to CTI's home office: 50 Shirley Street, Nassau, Bahamas, c/o Mrs. Heather Thompson. Alternatively, CTI may be served with process by serving either of its two directors, Phil Mulacek at 20 Piper Trace, Spring, Texas 77381, or Ronald Mulacek at 44 N. Edgewood, LaGrange, Illinois 60525.

## IV. Venue

28.     Venue is proper in Montgomery County, Texas, because a substantial part of the events and omissions giving rise to the claims occurred here; some or all of the defendants resided

here at the time the causes of action accrued; and some or all of the defendants have their principal Texas offices here.

## V. **Preliminary Statement**

29.     Mulacek and the entity defendants owe fiduciary duties to Plaintiffs, including the duty to disclose fully and fairly all material information relating to the investments at issue in this case.  Defendants have breached these duties and have failed to keep Plaintiffs fully informed.  As a result, Plaintiffs remain in the dark with respect to certain details of the transactions, acts and omissions described in this amended petition. Plaintiffs' allegations, therefore, are necessarily made, to some extent, on information and belief.  From the limited information supplied to Plaintiffs by Defendants and the information that Defendants have disseminated publicly, the facts recited herein that are not within Plaintiffs' personal knowledge are believed to be accurate.

## VI. **Derivative Action**

30.     To a large extent, the claims asserted in this case belong individually and directly to Plaintiffs.  To the extent any of the causes of action set forth below are deemed to belong to Nikiski Partners, Plaintiff Todd Peters hereby brings those claims derivatively in the right of Nikiski Partners and to recover a judgment in Nikiski Partners' favor.

31.     The statutory authority for Plaintiff Todd Peters to bring claims derivatively on behalf of Nikiski Partners is set forth in Article 10 of the Texas Revised Limited Partnership Act (the "Act").  Plaintiff Todd Peters qualifies as a proper derivative plaintiff under Section 10.02 of the Act because he is currently a limited partner of Nikiski Partners and because he was a limited partner of Nikiski Partners at the time of all of the transactions, acts and omissions alleged herein.

32.     The party with the authority to cause Nikiski Partners to file suit is P.I.E. Corp., its general partner.  Plaintiff Todd Peters has not demanded that P.I.E. Corp. cause Nikiski Partners to bring any of the claims asserted in this case because any such demand would not likely succeed and would be futile.  Demand would be futile in part because P.I.E. Corp. is itself a defendant in this action and is responsible for much of the wrongful conduct alleged herein.  It is extremely unlikely that P.I.E. Corp. would ever cause itself to be sued.

33.     It would also be futile to demand that P.I.E. Corp. cause Nikiski Partners to sue any of the other defendants named in this action.  The connection between P.I.E. Corp. and all other defendants is extremely close and virtually guaranties that P.I.E. Corp. would never sue them.

34.     For example, Defendant Phil Mulacek is one of the primary wrongdoers in this case, but he dominates and controls P.I.E. Corp.  He owns more than 90% of P.I.E. Corp.'s outstanding shares and he effectively makes any and all decisions on its behalf.  P.I.E. Corp. has no outside directors, and its entire board consists of Mulacek, his wife and his father.  Thus, any decision by P.I.E. Corp. to bring suit against Mulacek would be made by Mulacek himself, and the only people who could even theoretically challenge that decision would be Mulacek's closest family members.  It is thus extremely unlikely that P.I.E. Corp. would ever cause Nikiski Partners to sue Mulacek, no matter how compelling the facts.

35.     It is also impossible to believe that P.I.E. Corp would ever cause suit to be filed against Defendant P.I.E. Group, LLC or Defendant S.P. InterOil.  P.I.E. Corp. is the managing member of both of these companies, and it is P.I.E. Corp. that caused them both to engage in the transactions that are challenged in this case.  Thus, by suing P.I.E. Group, LLC and S.P. InterOil, P.I.E. Corp. would effectively be suing itself.

36.     Finally, it is likewise inconceivable that P.I.E. Corp. would ever cause suit to be filed against InterOil Corporation or any of its subsidiaries on the causes of action asserted in this case. It is alleged herein that P.I.E. Corp. used InterOil Corporation and its subsidiaries as the vehicles through which improperly to enrich itself at Plaintiffs' expense. By suing InterOil on these claims, P.I.E. Corp. would in effect be indicting itself. Requesting P.I.E. Corp. to do so would be futile.

37.     To the extent any of the causes of action asserted herein are deemed to belong to Nikiski Partners, all conditions set forth in Article 10 of the Act have been satisfied and this case should proceed, as to any such claims, as a derivative action for the benefit of Nikiski Partners.

38.     Whether a claim is an individual one belonging to an investor or a derivative one belonging to the entity in which the investor owns an interest is not always clear cut. Rule 48 of the Texas Rules of Civil Procedure expressly permits the assertion of alternative claims for relief. Plaintiff Todd Peters invokes Rule 48 and asserts, as to each cause of action stated herein, the right to recover derivatively (should the Court determine that the cause of action belongs to Nikiski Partners) and, alternatively, the right to recover individually (should the Court determine that the cause of action belongs to Todd Peters individually).

39.     Having reserved this right to recover under either alternative, Plaintiff Todd Peters believes, and therefore asserts, that the following causes of action belong to him individually (and that each of the additional Plaintiffs named in this Tenth Amended Petition own similar individual claims):

- Securities fraud in violation of the Texas Blue Sky Laws

- Investor oppression

- Breach of contract

- Common law fraud, statutory fraud, fraudulent inducement, breach of fiduciary duty, and knowing participation in breach of fiduciary duty (to the extent based on: false representations made to induce Plaintiffs' investments and their consent to the transfer of the Refinery; the preferential treatment afforded to APRI, Mulacek and his family and other insiders; the wrongful and discriminatory restrictions placed on Plaintiffs' units; the wrongful dilution of Plaintiffs' interests; and the failure to ensure that the partners in Nikiski Partners obtained, in the aggregate, a 20% interest in the Refinery venture).

40.     The remaining causes of action not identified in Paragraph 39 are: breach of fiduciary duty, knowing participation in breach of fiduciary duty, common law fraud and statutory fraud (to the extent based on the purchase of the Reformer and the usurpation of the partnership opportunity associated therewith). Even as to these causes of action, there is a legitimate argument that they are owned individually by Plaintiffs. That said, it is also conceivable that the claims associated with the Reformer could be deemed derivative. The Court will resolve this issue after appropriate briefing and argument and, under the reservation of rights stated above, Todd Peters is in all cases asserting such claims – whether the Court deems them to be direct or derivative.

41.     As to any cause of action that is deemed to be derivative, Nikiski Partners (although nominally sued herein as a defendant) would be the real party in interest and would effectively be the plaintiff.

## VII.  Facts

42.     Mulacek is a petroleum engineer who purports to be experienced in exploration-and-drilling activities. In 1981, he formed Petroleum Independent and Exploration Corporation ("P.I.E. Corp"). P.I.E. Corp. engaged in various exploration and related activities, primarily in the southwestern portion of the United States.

43.     Mulacek is the president and a director of P.I.E. Corp. He is also its controlling shareholder. Mulacek dominates and controls P.I.E. Corp. He has used P.I.E. Corp. as one of the

vehicles through which to commit the breaches of duty outlined herein and to enrich himself at the expense of Plaintiffs and others similarly situated.

### A.   The Chevron Refinery is Purchased with Investor Funds

44.     In 1993, Mulacek learned of the opportunity to purchase from Chevron a modular oil refinery (the "Refinery") capable of processing in excess of 30,000 barrels of crude per day.

45.     Chevron had previously operated the Refinery in Alaska.  Chevron closed the Refinery in June 1991 and was offering it for sale, with the requirement that the buyer remove it from the Chevron site.

46.     Mulacek desired to purchase the Refinery.  He envisioned either a quick resale of the Refinery at a profit or the establishment of some sort of joint venture to relocate and operate the Refinery at a new site, most likely in a foreign country.  Even before acquisition of the Refinery was complete, Mulacek and P.I. E. Corp. had identified Papau New Guinea in the Oceania Region of the South Pacific as a likely site for its relocation.

47.     Neither Mulacek nor P.I.E. Corp. had the financial means to buy the Refinery from Chevron.

48.     In February 1994, Mulacek and P.I.E. Corp. set out (through a newly created limited partnership called P.I.E. Refinery, Ltd.) to raise funds to purchase the Refinery.

49.     Mulacek created P.I.E. Refinery, Ltd. as a Texas limited partnership and installed P.I.E. Corp. as its general partner.  Mulacek and P.I.E. Corp. then touted the opportunity to invest in this limited partnership to a number of potential investors, many of whom were individuals who lived and worked in Montgomery County, Texas.

50.     The representations made to potential investors by Mulacek and P.I.E. Corp. were set forth, among other places, in a Private Offering Memorandum dated February 15, 1994 (the "Offering Memorandum"). Through the Offering Memorandum, Mulacek and P.I.E. Corp. sought to raise $2 million in "preferred" equity.

51.     Mulacek and P.I.E. Corp. represented to the preferred investors that the purchase price of the Refinery was $1,485,000. The balance of the $2 million in aggregate investment was set aside for "intangible costs," such as "administration," "intermediaries," "testing," "engineering," and "legal fees."

52.     Mulacek and P.I.E. Corp. also represented to investors in the Offering Memorandum that, in order to make the project economically viable, the Refinery would require a catalytic reformer that it did not then have. A reformer was necessary so that the Refinery could produce unleaded gasoline. Mulacek knew that the Government of Papua New Guinea ("PNG") would require such a reformer as a condition to any arrangement for relocation of the Refinery to PNG. The acquisition of a reformer was thus squarely within the scope and purpose of the project in which the preferred investors were being asked to invest. (As will be seen below, Mulacek and P.I.E. Corp. later used the acquisition of a reformer to enrich themselves and to dilute improperly the original investors.)

53.     In the Offering Memorandum, Mulacek and P.I.E. Corp. represented that the limited partnership would pursue one of three options for the Refinery:

a) The refinery can be position [sic] to be resold within four months of purchase to a third party, b) The refinery can be moved by skid to an adjacent property in Alaska, to maximize long term marketing and resale profits, c) The Preferred Units can be converted in to an ownership position in a Joint Venture refinery project in a niche market and realize the benefits from such placement.

54.     Mulacek and P.I.E. Corp. further represented that any resale of the Refinery would be "for not less than 20% capital gain per annum." They also represented that, if the Refinery were exchanged "for an equity position" in a company that would relocate and operate it, the limited partners would receive a 20% interest in the resulting entity. (It was represented that the remaining 80% would be allocated as follows: 25% to the "host country" in which the Refinery would be operated; 20% to P.I.E. Corp.; and 35% to future investors.)

55.     Ultimately, Mulacek and P.I.E. Corp. were successful in selling 40 preferred units in the limited partnership for $50,000 per unit, thereby raising a total of $2 million. (The investors who contributed this $2 million are collectively referred to in this amended petition as the "Nikiski Investors.")

56.     Each of the Plaintiffs named in this action was one of the original Nikiski Investors. The number of units purchased by each Plaintiff is set forth below:

|  |  |
|---|---|
| Todd Peters | 1 Unit[1] |
| LTPT, LLC/ Lloyd Tisdale | 2 Units |
| Jack Farris | ½ Unit |
| Ken Walker | ½ Unit |
| Mohammad Shafiq | 1 Unit |
| Howell Wiesner | 1 Unit |
| Chandrakant Patel | 1.6 Units |

---

[1] Through a two-step process, each of the 40 original units was later converted into 63,300 units.  First, four additional units were issued for each existing unit.  Through this first step, the original 40 units of Nikiski Partners were converted into a total of 200 units.  As an example, Todd Peters' initial unit became five units.  In the second step, each then-existing unit of Nikiski Partners was converted into 12,660 units.  After this conversion, Todd Peters owned 63,300 units (5 units x 12,660 = 63,300).

| Rasik & Pushpa Patel | 2.1 Units |
|---|---|
| A. Dearl Dotson Family LP | 2 Units |
| Crawford Oil Company/ John Crawford | 1 Unit |
| B&J Hughes Ventures, Ltd. | 2 Units |
| David Graumlich | 1 Unit |
| Fred and Joan Brown | ½ Unit |
| Molibari International | 1 Unit |
| Paul and Cathy Hughes | 1 Unit |
| Don Edd Wiesner | 1 Unit |
| James Jordan Group | Partial Unit |

57.     Upon making their investments, Plaintiffs and the other Nikiski Investors became parties, as limited partners, to the Limited Partnership Agreement of P.I.E. Refinery, Ltd. (the "Partnership Agreement").[2]   The representations contained in the Offering Memorandum that the preferred Nikiski Investors would have a 20% stake in any subsequent joint venture were repeated in the Partnership Agreement.  P.I.E. Corp., as general partner, thus assumed a contractual duty (as well as a fiduciary duty) to ensure that these representations were fulfilled.

58.     The promise of a 20% stake in any subsequent venture formed to relocate the Refinery was not the only protection granted to the Nikiski Investors.  The Partnership Agreement, as amended on March 28, 1994, also gave the limited partners two key rights through which to further protect their interests.  First, it provided that the Refinery could not be sold absent the

---

[2]In August 1994, the name of P.I.E. Refinery, Ltd. was changed to Nikiski Partners, Ltd.  That partnership is hereinafter referred to as "Nikiski Partners"or the "Partnership."

approval of a majority-in-interest of the limited partners.  Second, the Partnership Agreement gave the limited partners the right, upon the vote of a majority-in-interest, to remove P.I.E. Corp. as the general partner.

59.     In addition, the limited partners were entitled to rely on Mulacek and P.I.E. Corp. to put the interests of the limited partners ahead of their own interests.  As general partner of the limited partnership, P.I.E. Corp. owed fiduciary duties to each of the investors, including Plaintiffs. Mulacek (through his control and domination of P.I.E. Corp. and his role as promoter and principal architect of the Refinery project) also owed fiduciary duties to each of the investors.  Mulacek and P.I.E. Corp. were obligated, among other things, to ensure that the representations made to the original Nikiski Investors were honored and that their interests were adequately protected.

60.     The purchase of the Refinery from Chevron closed on April 1, 1994.  Although P.I.E. Corp. was named in the Bill of Sale as the nominal purchaser, the money for the acquisition came solely from the funds Mulacek and P.I.E. Corp. had raised from Plaintiffs and the other Nikiski Investors.

61.     Although Mulacek had initially indicated that the purchase price for the Refinery was $1,485,000, that price was reduced through negotiations with Chevron to $1,135,000, thus saving $350,000 of the funds contributed by the Nikiski Investors.  In a September 2, 1994, letter to the Nikiski Investors, Mulacek bragged that he had achieved "[a]cquisition savings of $350,000.00 on the Nikiski Refinery."

**B.        Mulacek Decides that 20% is Not Enough for Himself and P.I.E.**

62.     As mentioned above, P.I.E. Corp. represented in the Offering Memorandum (and promised in the Partnership Agreement) that P.I.E. Corp.'s share of any joint venture formed to

relocate and operate the Refinery would be 20% – equal to the interest of the Nikiski Investors. Mulacek either never intended to honor that promise or he decided, sometime shortly after the Refinery was acquired, that 20% was not enough for P.I.E. Corp.

63.     Having come to that conclusion, and assuming there were a good-faith basis for it, P.I.E. Corp. and Mulacek could have simply asked the Nikiski Investors to approve a re-allocation of interests.  Instead – and because they lacked a good-faith basis – Mulacek and P.I.E. Corp. (unbeknownst to the Nikiski Investors) embarked on an undisclosed scheme to secretly divert to themselves a greater share of the pie, at the expense and without the authorization of the Nikiski Investors.

64.     The scheme to enrich P.I.E. Corp. and Mulacek was hatched by no later than early 1995, which is about the time that Mulacek met Gaylen J. Byker.  Byker identified himself as an experienced financier who could help Mulacek structure a financing plan for the Refinery project. Byker also indicated that he had contacts with many potential financing sources, such as Enron and the Overseas Private Investment Corporation ("OPIC") (an arm of the U.S. Government).

65.     Mulacek decided to give Byker a significant piece of the Refinery project, presumably in exchange for his help in facilitating Mulacek's scheme.  Byker created a limited partnership known as Asia Pacific Refinery Investment L.P. ("APRI") to be his investment vehicle.

66.     Once APRI was created, the plan to divert value to Mulacek and P.I.E. Corp. (at the expense of the Nikiski Investors) was put into full operation.  Mulacek and P.I.E. Corp. chose Commodities Trading International Corporation ("CTI") as the vehicle through which to accomplish their goal.  CTI,  at the time, was a shadowy Bahamian company owned by Maurice Vinson – Mulacek's grandfather.

67.     The plan called for CTI to become the nominal owner of a significant interest in the Refinery project.  In reality, Mulacek and/or P.I.E. Corp. would secretly retain the economic benefits of CTI's ownership interest.  The family connection between Mulacek and CTI – and the beneficial interest retained by Mulacek and P.I.E. Corp. in CTI's ownership position –  would be concealed from the Nikiski Investors and from others.  To the extent the Nikiski Investors ever learned of CTI's role, it could be made to appear that CTI was an unaffiliated third party who had obtained its interest on an arms' length basis, when in reality Mulacek and P.I.E. Corp. secretly controlled CTI and all economic benefits allocated to it.

68.     By April 7, 1995, a crude version of this plan had crystalized and was documented in a letter agreement signed by Byker (on behalf of APRI) and Mulacek (on behalf of P.I.E. Corp. and purportedly on behalf of Nikiski Partners).  That letter agreement, which was never provided to the Nikiski Investors, contemplated: (a) that Mulacek would form a new entity to be called InterOil; (b) that P.I.E. Corp. would cause the Refinery to be contributed to InterOil; (c) that APRI would invest $1.5 million in cash in InterOil; (d) that CTI would make only a nominal cash investment and would not contribute anything else of value; and (e) that the ownership of InterOil would be allocated 20% to APRI; 17.5% to P.I.E. Corp.; 17.5% to the Nikiski Investors; 25% to CTI; and 20% to potential new investors.

69.     Under this plan, the original Nikiski Investors – having contributed the most – would have gotten the least.  APRI would have received 20% for its $1.5 million in cash, while the $2 million cash investment of the Nikiski Investors would have earned them only 17.5%.  And, even more incredibly, CTI – Mulacek's family-owned company – would have received a 25% stake in exchange for only a nominal investment.

70.     In this early version of the plan, Mulacek was not yet sophisticated enough to provide a cover story for granting his grandfather's company a 25% interest in exchange for little or no consideration. Rather, the letter agreement made clear that CTI, in essence, would receive its 25% interest as a gift, without having to contribute anything of value. The cover story for this outrageous breach of fiduciary duty would not come until later.

71.     In February 1995, Mulacek and P.I.E. Corp. made a partial and misleading disclosure of this contemplated transaction to the Nikiski Investors. They disclosed to the Nikiski Investors the intention to form InterOil Corporation, and they even solicited the consent of the Nikiski Investors to convey the Refinery to the new company. Mulacek and P.I.E. Corp. also disclosed that the Nikiski Investors were projected to receive a 17.5% interest in InterOil. But, Mulacek and P.I.E. Corp. concealed the fact that APRI was to receive preferential treatment in the form of a disproportionate allocation of shares. Mulacek and P.I.E. Corp. also failed to make any disclosure whatsoever concerning CTI, let alone any disclosure that CTI was nominally owned by Mulacek's grandfather and that it was slated to become the single largest shareholder (25%) of InterOil in exchange for having invested essentially nothing.

72.     Ultimately, the structure contemplated by the April 7 letter agreement was modified before it was implemented. But, its existence – and the false and misleading disclosures that Mulacek and P.I.E. Corp. made about it – demonstrate that, as early as 1995, Mulacek and P.I.E. Corp. intended to use CTI to enrich themselves at the expense of the original Nikiski Investors. There simply is no other explanation for the undisclosed scheme to make a family-owned company the single largest shareholder of InterOil and to divert to it a 25% interest in exchange for essentially no consideration.

C.   **Mulacek Bypasses the Nikiski Investors and**
**Acquires the Reformer in CTI's Name**

73.     By 1996, the plan to use CTI as the vehicle to enrich Mulacek and P.I.E. Corp. had become slightly more sophisticated.  Mulacek apparently came to understand that he would need a cover story for the decision to divert significant value to CTI, which was nominally his grandfather's company.  The catalytic reformer that had to be purchased so that the Refinery could produce unleaded gasoline was used to fabricate that cover story.

74.     As noted above, the Refinery required a separate catalytic reformer in order to be capable of producing marketable, unleaded gasoline.  While the Refinery acquired from Chevron lacked such a reformer, acquisition of one was clearly within the scope of the venture in which Plaintiffs invested.  The need for a reformer – and the intent to acquire one – were discussed in the Offering Memorandum.  Acquisition of a reformer, moreover, is clearly within the scope of the partnership purposes described in the Partnership Agreement.  The Partnership had a legitimate interest and expectancy in acquiring any reformer that Mulacek and/or P.I.E. Corp. identified for purchase.

75.     By early to mid 1995, Mulacek and P.I.E. Corp. had identified a semi-regenerative catalytic reformer (with a matching hydro-desulphurizer) (the "Reformer") located in Oklahoma that could be refurbished and converted for use with the Refinery.  On information and belief, the costs incurred in locating, inspecting and assessing the Reformer were paid for with Partnership funds invested by Plaintiffs and the other Nikiski Investors.

76.     The Reformer was available for purchase for only $250,000.  The Partnership clearly had the financial resources to purchase the Reformer – if for no other reason because $350,000 had been saved on the purchase of the Refinery from Chevron.

77.     Mulacek and P.I.E. Corp. initially purchased the Reformer in the summer of 1995, in the name of P.I.E. Corp.  On information and belief, money contributed by the original Nikiski Investors was used to fund the Reformer's $250,000 purchase price.  P.I.E. Corp., in 1995, was presumably holding title to the Reformer on behalf of and for the benefit of Nikiski and the Nikiski Investors.

78.     In early 1996, as the plans to form InterOil as a public company began to crystalize, Mulacek and P.I.E. Corp. doctored the records to make it appear as if CTI – not P.I.E. Corp. or Nikiski – was the purchaser of the Reformer.  Notwithstanding that P.I.E. Corp. had actually bought the Reformer in 1995, Mulacek and P.I.E. Corp. created a false paper trail that made it seem as if CTI had acquired the Reformer directly from the Oklahoma seller in a transaction that purportedly closed on February 17, 1996.  CTI, on information and belief, never reimbursed P.I.E. Corp. or Nikiski for the costs incurred in connection with the purchase of the Reformer.

79.     The stage was thus set to use the Reformer as cover for diverting value – through CTI – to Mulacek and P.I.E. Corp.

**D.     Mulacek and P.I.E. Strip Control of the Refinery from Nikiski Partners**

80.     Once the record was doctored to make it appear as if CTI had acquired the Reformer, the pieces were in place to execute a more sophisticated version of Mulacek's plan.

81.     By February 1996, an affiliate of Enron was interested in entering into a joint venture to relocate the Refinery to Papau New Guinea.  Mulacek and P.I.E. Corp., with Byker's assistance, established a structure that would allow for an Enron investment, while also creating the means to divert to Mulacek and P.I.E. Corp. substantial value that should have flowed to the original Nikiski Investors.

82.     The ultimate goal was to form a public company.  One of the motivations for doing so was to create a mechanism through which to obtain immediate liquidity for the 25% ownership stake in the Refinery project that, since at least April 1995, Mulacek had been scheming to divert to CTI (for the secret benefit of Mulacek and P.I.E. Corp.).

83.     Creation of a public company to facilitate Mulacek's scheme was a complicated process involving many steps.  By November 1996, Mulacek and P.I.E. Corp. had identified each of the necessary steps and had a fully developed plan to implement them.  Getting ownership of the Refinery into a new entity – so that the original Nikiski Investors would no longer have the right to veto (or even to be informed about) any subsequent transfers – was key to the success of this scheme. Mulacek and P.I.E. Corp. accomplished this critical step through misrepresentations, material omissions and blatant breaches of fiduciary duty owed to the Nikiski Investors.

84.     P.I.E. Group, LLC ("P.I.E. Group"), a Delaware limited liability company, is the new entity Mulacek and P.I.E. Corp. created for this purpose.[3]  Mulacek installed P.I.E. Corp. as the sole manager of P.I.E. Group and structured the company so that P.I.E. Corp. could not be removed as manager without its consent.

85.     Mulacek and P.I.E. Corp. then induced the Nikiski Investors to consent to the conveyance of the Refinery to P.I.E. Group.  In exchange for transferring the Refinery, Nikiski Partners ultimately obtained a 28.76% ownership interest in P.I.E. Group.  Mulacek and P.I.E. Corp. allocated the balance of the ownership interests as follows: 31.61% to APRI; 34.81% to P.I.E. Corp.

---

[3]P.I.E. Group and CTI, by allowing themselves to be used as instruments through which P.I.E. Corp. and Mulacek wrested control of the Refinery away from Nikiski Partners and diverted value to Mulacek, assumed fiduciary duties to Plaintiffs and the other Nikiski limited partners. P.I.E. Group and CTI are equally responsible for the many misrepresentations and material omissions made by Mulacek and P.I.E. Corp.

and to various shareholders of P.I.E. Corp. (all of whom are Mulacek family members); and 4.81% to various individuals who invested at about the same time as the original Nikiski Investors.

86.     No information about this ownership breakdown was provided to the Nikiski Investors when they were asked to consent to the transfer of the Refinery to P.I.E. Group.  In fact, their consent to the transfer of the Refinery was solicited through a fax cover sheet, dated November 22, 1996, that contained virtually no meaningful information.  That cover sheet merely stated – with no elaboration or explanation – that the transfer of the Refinery was necessary for "tax and business planning purposes."

87.     The fax cover sheet did refer back to an earlier disclosure to the Nikiski Investors from February 1995 in which they were assured by Mulacek and P.I.E. Corp. that, in any transfer of the Refinery to a new entity, their interests would be adequately protected and preserved.  The February 1995 representations, which were effectively incorporated by reference into the fax of November 22, 1996, included assurances that  P.I.E. Corp. and Mulacek would:

- "Protect and enhance the original investment of the Nikiski Partners"

- "Maintain project control with the Nikiski Partners"

- "Maximize Nikiski/P.I.E. participation on the resale potential"

- "Maintain the Nikiski Partners project equity in the refinery placement for [Papau New Guinea], while reducing risk"

- "Establish a short term distribution, mid-term capital recovery, and long term dividends with a possible P.E. buy-out"

88.     These assurances from February 1995 were entirely consistent with the terms of the Partnership Agreement itself, which required P.I.E. Corp., in these circumstances, to "assess appropriate business structures," to obtain appropriate business, legal and accounting advice, and to

propose only those "revisions to the structure and form of the business of the Partnership [that are] in the best interest of the partners." (Emphasis added.)

89.     The transfer of the Refinery to P.I.E. Group in November 1996 breached these provisions of the Partnership Agreement.  The representations made to Plaintiffs and the other Nikiski Investors in November 1996  to obtain their consent to the transfer were also fraudulent in a number of respects.

90.     First, Mulacek and P.I.E. Corp. failed  to state many material facts.  Without these additional facts, the statements that were made were grossly misleading.  The omitted facts include:

- That the transfer of the Refinery was part of an already negotiated global transaction pursuant to which P.I.E. Corp. and APRI were also going to receive ownership interests in P.I.E. Group.

- That, notwithstanding prior representations that the Nikiski Investors would receive preferred treatment, P.I.E. Corp. and APRI were going to receive more units in P.I.E. Group than the Nikiski Investors in exchange for having contributed less.

- That Mulacek and P.I.E. Corp. had, in allocating the ownership of P.I.E. Group, breached their fiduciary duties to the Nikiski Investors.

- That the transfer of the Refinery to P.I.E. Group would effectively strip the limited partners of Nikiski Partners of the two key rights they then possessed – to approve subsequent transfers of the Refinery and to remove P.I.E. Corp. as general partner.

- That the transfer of the Refinery was just one step in an overall transaction that had already been negotiated and pursuant to which Nikiski Partners, despite earlier representations, would end up with substantially less than 20% of the Refinery project.

- That P.I.E. Corp. had initially purchased the Reformer and that Mulacek and P.I.E. Corp. later improperly diverted that opportunity to CTI.

- That the transfer of the Refinery was part of an overall, already-negotiated transaction pursuant to which CTI would be assigned over $15 million in value (and 5.1 million shares in the resulting company) in exchange for

contributing only a $250,000 Reformer, whereas the Nikiski Investors would get only 2.6 million units in exchange for contributing $2 million in cash.

- That CTI would be granted, almost immediately, the opportunity to liquidate its shares on a public market, while significant restrictions and limitations would be imposed on the ability of the Nikiski Investors to liquidate their interests.

- That CTI – the company receiving this wildly preferential treatment – was owned by Mulacek's grandfather.

- That Mulacek and P.I.E. Corp. retained a secret interest in the economic value being diverted to CTI.

- That Mulacek and P.I.E. Corp. had secretly established a Canadian company that would be used to divert – in exchange for no consideration – 265,000 shares of InterOil to Mulacek and his family members and insiders.

- That Mulacek and P.I.E. Corp., in structuring this transaction, had crippling conflicts of interest and, at every turn, favored others (mostly Mulacek's family and his cronies) over the original Nikiski Investors.

91.     Second, Mulacek and P.I.E. Corp. made affirmative misrepresentations of material fact. They passed off the transfer of the Refinery to P.I.E. Group as a routine matter necessary for "tax and business planning purposes." They further represented that the transfer would "maintain project control with Nikiski Partners," would "protect and enhance the original investment of the Nikiski Partners," and would "maintain the Nikiski Partners project equity in the refinery placement for PNG, while reducing risk." These statements were false. In fact, the transfer was designed to, and operated to, consolidate with Mulacek and P.I.E. Corp. nearly complete control over the Refinery, to strip project control away from Nikiski Partners, to dilute improperly the project equity of the original Nikiski Investors, and to enrich Mulacek and P.I.E. Corp. at the expense of Nikiski Partners.

46447

92.   In short, Mulacek and P.I.E. Corp. fraudulently obtained consent to transfer the Refinery to P.I.E. Group in violation of their fiduciary duties to the Nikiski Investors.

**E.   Mulacek and P.I.E. Corp. Create InterOil –
A Company Founded in Fraud**

93.   Once consent was obtained (fraudulently) to transfer the Refinery to P.I.E. Group, Mulacek and P.I.E. Corp. were poised to execute the rest of their plan.

94.   The plan required the creation of no fewer than five new companies (in addition to P.I.E. Group).  Two Canadian companies were formed (one a New Brunswick company, and the other an Ontario company).  In addition, Mulacek and P.I.E. Corp. created  new companies in the Bahamas, the Cayman Islands and PNG.

95.   The structure created by Mulacek and P.I.E. Corp. can be graphically depicted as follows:



96.     The Bahamian company, called S.P. InterOil, L.D.C. ("SP InterOil"), became the centerpiece of the structure.[4]  Mulacek and P.I.E. Corp. set up SP InterOil so that it would have four owners: P.I.E. Group; CTI; InterOil Corporation (the New Brunswick company); and South Pacific InterOil Corporation (the Ontario company).  Mulacek and P.I.E. Corp. took it upon themselves to allocate the stock of SP InterOil among these four owners, and they did so in clear violation of their fiduciary duties to Plaintiffs.

97.     Mulacek and P.I.E. Corp. granted P.I.E. Group a <u>44.5%</u> interest in SP InterOil in exchange for its contribution of the Refinery and in alleged recognition of the cash contributed by APRI and the so-called "intangibles" purportedly contributed by P.I.E. Corp.  In so doing, Mulacek and P.I.E. Corp. breached their fiduciary duties to Plaintiffs by: (a) favoring APRI and P.I.E. Corp. over the original Nikiski Investors; (b) undervaluing the Refinery; (c) overvaluing the contributions of APRI and P.I.E. Corp.; and (d) allowing the Refinery to be contributed to a new venture in which the original Nikiski Investors would have significantly less than the 20% interest they were promised.

98.     Mulacek and P.I.E. Corp. granted CTI a <u>25%</u> interest in SP InterOil in exchange for CTI's contribution of the Reformer.  In an attempt to justify this ownership share, Mulacek and P.I.E. Corp. valued the Reformer at over $15 million, even though it had been purchased just a few months earlier for only $250,000.  In granting CTI a 25% interest, Mulacek and P.I.E. Corp. breached their fiduciary duties to Plaintiffs either because the Reformer was in reality worth only a fraction of the inflated value they assigned to it or, alternatively, because the opportunity to purchase the Reformer

---

[4]P.I.E. Corp. was installed as the general manager of SP InterOil.  Under Bahamian law, a general manager has essentially the same duties and authority as the board of directors of a U.S. corporation.  Mulacek structured the company so that P.I.E. Corp. could not be removed as general manager of SP InterOil without its consent.

(especially if it really was possible for it to increase in value by 6,000% in just a few short months) was a partnership opportunity wrongfully usurped from Nikiski Partners.

99.    Mulacek and P.I.E. Corp. set aside a <u>29.1%</u> interest in SP InterOil to grant to investors from whom Mulacek had raised (or was planning to raise) several million dollars in new money.  In so doing, Mulacek and P.I.E. Corp. breached their fiduciary duties to Plaintiffs because this allocation contributed to the dilution of the original Nikiski Investors to an ownership stake below the 20% they had been promised (and even below 10%).

100.    Mulacek and P.I.E. Corp. granted South Pacific InterOil Corporation (the Ontario company) a <u>1.4%</u> interest in SP InterOil in exchange for no consideration at all.  South Pacific InterOil Corporation was owned by Mulacek and various family members and other insiders.  The grant to South Pacific InterOil of any interest in SP InterOil was a breach of fiduciary duty because South Pacific InterOil had done nothing to earn this interest and because the ownership percentage assigned to it should have been allocated instead to the Nikiski Investors.

101.    Once this fraudulent structure was in place, Plaintiffs (and the other limited partners of Nikiski Partners) had gone from having an interest in an entity that directly owned the Refinery to having an indirect ownership interest in an entity that might (subject to the whim of Mulacek and his P.I.E. entities) someday be granted shares of stock in a public company that now beneficially owned the Refinery.

102.    Mulacek and P.I.E. Corp., on the other hand, had eliminated the need to obtain the approval of the Nikiski limited partners to dispose of the Refinery; had eliminated the risk that they could lose control over the Refinery through a vote of the Nikiski limited partners to remove P.I.E. Corp. as general partner; had created a mechanism through which to turn their interests (and those of their affiliates) into cash; had wrongfully diverted a 25% interest in InterOil to themselves

(through CTI); and had wrongfully diverted an additional 1.4% interest to themselves (through the Ontario company).

### F.    Defendants Create, and Then Wrongfully Restrict Access to, a Public Market

103.    After establishing this structure, Mulacek and P.I.E. Corp. caused InterOil Corporation (the New Brunswick Company) to merge into a public shell company that was traded on the Canadian Dealer Network.  InterOil Corporation was the surviving entity, and it was now a public company.

104.    With a public company in place, Mulacek and P.I.E. Corp. had to find a way to convert ownership interests in SP InterOil into shares of InterOil Corporation.  To do so, Mulacek and P.I.E. Corp. created exchange rights pursuant to which P.I.E. Group, CTI and South Pacific InterOil could redeem their shares in SP InterOil, on a one-for-one basis, for shares in InterOil Corporation, the public company.

105.    In theory, these exchange rights were potentially beneficial to all of the direct and indirect owners of SP InterOil, as they provided the mechanism through which their investments could be liquidated via stock sales on a public exchange.  And, since InterOil Corporation was formed in early 1997, there has continuously existed a public market for its shares:

- Upon creation of InterOil in 1997, its shares were publicly traded on the Canadian Dealer Network.

- In November 1999, InterOil shares were listed for trading on the Port Moresby Stock Exchange in Papau New Guinea.

- In August 2002, a derivative instrument related to InterOil shares commenced trading on the Australian Stock Exchange.

- In July 2004, InterOil shares began trading on the Toronto Stock Exchange.

- In September 2004, InterOil shares were listed for trading on the American Stock Exchange and now are traded on the New York Stock Exchange.

106.    P.I.E. Corp. and Mulacek, however, did not provide all owners of SP InterOil with equal access to the public markets.  In fact, only CTI and South Pacific InterOil – the entities owned by Mulacek and/or his family members and who had fraudulently been granted their interests – have been allowed to convert and sell all of their shares.

107.    P.I.E. Corp. and Mulacek allowed CTI to convert all of its stock in SP InterOil into freely tradeable shares of the public company almost immediately after InterOil was formed.  CTI has in fact converted and sold all of its 5.1 million shares.  While Plaintiffs do not know exactly when CTI's shares were liquidated, Plaintiffs do know that the market price for InterOil shares has reached a high of $44 per share – which means that CTI at least had the opportunity to reap almost $225 million.  P.I.E. Corp. and Mulacek, on information and belief, have received some or all of the cash generated by these stock sales.

108.    P.I.E. Corp. and Mulacek also allowed South Pacific InterOil (the company that he and his family members owned) to convert its shares of SP InterOil for stock in the public company and to sell that stock.  Those 265,000 shares, if sold at the height of the market, would have yielded for Mulacek and his family an additional $11.6 million.

109.    While Mulacek and P.I.E. Corp. were allowing CTI and South Pacific InterOil to convert and sell all of their shares, the interests of the original Nikiski Investors were tied up in P.I.E Group.  Soon after InterOil was formed, Mulacek and P.I.E. Corp. did deign to allow Plaintiffs and some of the other Nikiski Investors to convert and sell a small fraction of their Nikiski units.[5]

---

[5] As a result of these limited redemptions and sales, Todd Peters, when this lawsuit was filed, owned 51,000 units.

However, from  approximately September 1997 until this lawsuit was filed, Mulacek and P.I.E. Corp., in concert with the other defendants, have purported to deny Plaintiffs (and the remaining Nikiski Investors) the right to redeem and sell their remaining units.

110.    Defendants have offered a variety of excuses for denying Plaintiffs the right to redeem and sell their Nikiski units.  It is difficult to imagine how those excuses could have any validity in light of the fact that Mulacek and P.I.E. Corp. did not also impose them on the 5.1 million shares held in CTI's name and the 265,000 shares owned by South Pacific InterOil (two companies owned by the Mulacek family).  But, even if there were somehow a basis on which to treat P.I.E. Group differently,  Defendants have breached their fiduciary duties by applying the restrictions, within P.I.E. Group, on a disproportionate and discriminatory basis to the detriment of Plaintiffs and the other Nikiski Investors.

111.    For example, prior to the OPIC loan (which is the current excuse for the restriction on share conversion), the original Nikiski Investors had, in the aggregate, been allowed to convert and sell only 6.84% of the P.I.E. Group units that had been allocated to them.  Mulacek, his family members and his cronies, on the other hand, had been allowed to convert and sell significantly more of their P.I.E. Group units, as follows:

| | |
|---|---|
| Mulacek individually | 64.6% |
| APRI (Gaylen Byker's company) | 35.0% |
| Pierre Mulacek (Phil's brother) | 28.6% |
| Ronald Mulacek (Phil's father) | 27.5% |
| Christian Vinson (Phil's brother in law) | 21.26% |
| Kathleen Mulacek (Phil's wife) | 20.8% |
| Michelle Vinson (Phil's sister) | 14.45% |

    •     Five Sterling (Phil's family partnership)     12.47%

There is no justification for Mulacek and his family receiving this preferential treatment, and it constitutes a blatant breach of fiduciary duty.

112.     And, in any event, the excuses offered for the restrictions imposed on Plaintiffs' ability to convert and sell their units have no validity. In 1997, Plaintiffs were told that their right to redeem and sell shares was being limited because of "restrictions and requirements by the major Canadian stock exchanges" on which Mulacek and P.I.E. hoped, in the future, to have InterOil stock listed.

113.     In 2000, Plaintiffs were told that their right to redeem and sell shares was being limited, in part, based on Defendants' perception of "market conditions."

114.     By 2001, Defendants were basing their purported ability to restrict the right of Plaintiffs to redeem his Nikiski units and sell the resulting shares of InterOil stock on the requirements of an $85 million loan InterOil obtained from OPIC.

115.     None of the purported justifications for this treatment has any validity. Defendants' desire to control and manipulate the market price for InterOil stock (by preventing shareholders from selling their shares) hardly justifies their treating Plaintiffs on a discriminatory basis. Nor do hypothetical restrictions allegedly imposed by stock exchanges on which InterOil stock was not even listed for sale. And, if these restrictions were real, they would and should have been applied uniformly to all shareholders, but they were not.

116.     The OPIC loan, likewise, does not justify Defendants' actions in denying Plaintiffs the right to redeem and sell their units.

117.     Defendants claimed that OPIC required, as a condition to the loan, that InterOil, throughout the 12-year term of the loan, maintain at least 25% U.S. ownership. Because P.I.E.

46447                           29

Group qualifies as a U.S. owner under OPIC rules, Defendants announced that all of P.I.E. Group's remaining shares of InterOil (including the shares to which the original partners of Nikiski Partners are entitled upon redemption of their units) would be restricted so as to meet this alleged OPIC requirement.

118.   Defendants' assertion that P.I.E. Group's stock must be restricted in order to satisfy conditions of the OPIC loan appears to be untrue for at least two reasons.

119.   First, in a public filing made on March 31, 2006, Defendants finally admitted that they were able to satisfy the "U.S. content necessary for us to obtain $85 million in project financing from [OPIC]" through P.I.E. Corp.'s ownership of "5,000 (0.02%) of the outstanding ordinary shares of S.P. InterOil, LDC." P.I.E. Group's ownership of its interest thus appears, by Defendants' own admission, to be unnecessary to the maintenance of the OPIC loan.

120.   Second, and in any event, InterOil has any number of U.S. shareholders – in addition to P.I.E. Group – whose U.S. status could be used to satisfy any requirement that at least 25% of InterOil be owned by U.S. shareholders.

121.   Under OPIC definitions, a "U.S. Person" includes a corporation or other entity chartered under the laws of any U.S. state if more than 50% of its shares are owned, either directly or beneficially, by U.S. citizens.  If shares are held in the names of trustees or nominees (such as brokerage firms), such shares are deemed to be owned by U.S. citizens, so long as the trustee or nominee has a U.S. address and so long as there is not actual knowledge that the beneficial owners are not U.S. citizens.

122.   Applying these definitions, any requirement that InterOil have at least 25% U.S. ownership could have been satisfied without restricting all of the shares of P.I.E. Group.  There

46447                                    30

simply is no basis on which to require Plaintiffs and the other Nikiski Partners to bear the entire

brunt of any OPIC requirement on U.S. ownership.

123.    In addition, Mulacek and P.I.E. Group could have structured CTI – which they

beneficially own and/or control – as a "U.S. Person" so that the vast amount of InterOil stock

fraudulently assigned to it would have been available to satisfy any requirement that InterOil retain

25% U.S. ownership.  They failed to do so and instead allowed CTI to sell its InterOil stock, while

Plaintiff was being denied the right to do the same.

124.    Finally, P.I.E. Corp., P.I.E. Group, and Mulacek and the other Defendants had a

fiduciary duty to structure the OPIC loan so that it would not discriminatorily impact the original

Nikiski Investors as compared to later investors.  To the extent Defendants allowed the OPIC loan

to be structured so that P.I.E. Group's shares must be restricted, they breached their fiduciary duties

to Plaintiffs.

### G.    InterOil and Its Affiliates Ratify the Wrongful Acts of Mulacek and P.I. E. Corp.

125.    Mulacek and P.I.E. Corp. were the architects of the scheme described above.  The

scheme, however, could not have been implemented without the involvement and approval of P.I.E.

Group, SP InterOil, EP InterOil and InterOil Corporation.

126.    Mulacek and P.I.E. Corp., accordingly, obtained the consent, approval and ratification

of each of these entities at each critical step of the process.

127.    By way of example only, InterOil, the public company, expressly ratified the key

elements of this scheme in a board meeting held on July 30, 1997.  SP InterOil did the same by

resolution dated November 27, 1996.  And, each time that CTI or other members of Mulacek's

insider group were allowed to convert and sell shares, the express approval of InterOil Corporation and SP InterOil was required, and that approval was freely given.

128.    These additional Defendants, moreover, cannot claim that they were ignorant of Mulacek's wrongdoing when they ratified and approved the key elements of the plan through which Mulacek and P.I.E. Corp. enriched themselves.  Mulacek has sworn that, prior to obtaining their consent, approval and ratification, he made full disclosure to each entity of the material facts, including the circumstances surrounding acquisition of the Reformer; the fact that CTI was owned by his grandfather; and the fact that P.I.E. Corp. was acting on behalf of CTI.  Thus, none of these entities can claim that Mulacek was somehow acting in an *ultra vires* way.  Each of P.I.E. Group, SP InterOil, InterOil and EP InterOil ratified the acts and omissions of Mulacek and P.I.E. Corp. and is thus liable for them.

### H.    Additional Breaches of Duty Since Suit Was Filed

129.    Since suit was filed, Mulacek and the Defendants he controls have engaged in additional breaches of fiduciary duty and other wrongful conduct toward Plaintiffs.

130.    Specifically, but without limitation, Defendants, sometime in 2008 and/or 2009, allowed all Nikiski Partners except Plaintiff Todd Peters and his parents to exchange a substantial portion of their units for shares of InterOil. Without explanation or excuse, Defendants denied Plaintiff Todd Peters this opportunity.  Defendants singled out Todd Peters for this blatantly discriminatory treatment to punish him for having filed this lawsuit.  By doing so, Defendants breached fiduciary duties owed to Plaintiff Todd Peters.

131.    In addition, in May 2008, Mulacek, for himself and on behalf of P.I.E. Corp. and the other Defendants, engaged in a scheme they hoped would force dismissal of any of Plaintiffs' claims

that are determined to be derivative in nature. Specifically, Defendants presented to many of the original Nikiski Investors a document that purported to constitute an amendment to the Nikiski partnership agreement. The amendment contained language that purported to ratify everything and anything Defendants had ever done (or failed to do); to release Defendants of any and all wrongdoing of any kind or character; and to authorize the dismissal of any derivative claims filed, for the benefit of Nikiski Partners, against Defendants.

132.   P.I.E. Corp. and Mulacek clearly owed fiduciary duties to each of the Nikiski Investors to whom they presented the purported partnership amendment. P.I.E. Corp. and Mulacek were also burdened at the time by a clear conflict of interest – on the one hand, they owed a duty to protect and further the interests of Nikiski Partners; on the other hand, they were seeking to have themselves released from millions of dollars of potential liability. Because Mulacek and P.I.E. Corp. were acting as fiduciaries and had a crippling conflict of interest, the purported partnership amendments that they induced certain Nikiski Investors to sign are presumed to be unfair and invalid. The amendments could not conceivably be enforceable (if they ever could be) unless Mulacek and P.I.E. Corp. could prove that they acted in good faith; that they made full, complete and accurate disclosure of all material facts to the Nikiski Investors; and that the purported amendment is reasonable and fair to the Nikiski Investors and to the partnership.

133.   Defendants cannot possibly make that showing. In fact, discovery has revealed that Mulacek made affirmative misrepresentations of material fact to the Nikiski Investors who signed the purported amendment and failed to disclose material facts to them. Mulacek and P.I.E. Corp. did not act in good faith. The purported amendment is neither fair nor reasonable. Rather, it is either void or voidable.

46447                                                          33

134.    By inducing certain Nikiski Investors to sign the purported amendment, Defendants have further breached their fiduciary duties to Plaintiffs, to the partnership and to the Nikiski Investors.

135.    Each of the Plaintiffs who signed the amendment hereby disavows it and asks the Court to declare it invalid and unenforceable.  The amendment is unenforceable because it was procured through breaches of fiduciary duty and by fraudulent misrepresentations and omissions that would be actionable even in an arms-length context.

## VIII.  **Statement of Claims Against Defendants**

136.    Plaintiff asserts the following causes of action against Defendants.

### A.    **Breach of Fiduciary Duty**

137.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

138.    Each Defendant, by virtue of its status or position or by virtue of its knowing and active participation in the schemes detailed above, owed or assumed fiduciary duties directly to Plaintiffs and to Nikiski Partners.  Without limiting the forgoing, Phil Mulacek and P.I.E. Corp., in particular, owed fiduciary duties to Plaintiffs by virtue of their formal status as the general partner of Nikiski Partners (and as the control-person of the general partner) and by virtue of an informal relationship of trust and confidence that has existed between them and Plaintiffs.

139.    Defendants have breached their fiduciary duties to Plaintiffs and to Nikiski Partners by, among other things, structuring Nikiski Partners, P.I.E. Group, SP InterOil, EP InterOil and InterOil (and their related entities) to lock Plaintiffs into an illiquid investment; denying Plaintiffs the right to redeem their interests in Nikiski Partners for stock in InterOil; imposing discriminatory and unwarranted restrictions on the right of Plaintiffs to redeem interests in Nikiski Partners for

InterOil stock; fraudulently obtaining Plaintiffs' consent to the transfer of the Refinery to P.I.E. Group; favoring APRI and P.I.E. Corp. in the allocation of ownership interests in P.I.E. Group; wrongfully diverting interests to CTI and South Pacific InterOil; converting the Reformer and/or usurping the opportunity to purchase the Reformer;  improperly diluting Plaintiffs' interests by, among other things, improperly allocating to CTI shares of SP InterOil and/or InterOil based on an inflated and unreasonable valuation of the Reformer; and failing to ensure that the Nikiski Investors obtained a 20% interest in the entity that operates the Refinery.

140.    As a proximate result of these breaches, Plaintiffs and/or Nikiski Partners have been severely harmed, and Defendants have reaped substantial profits.  Defendants should be required to disgorge their ill-gotten gains and to compensate Plaintiffs and/or Nikiski Partners for their damages.

**B.    Knowing Participation in Breach of Fiduciary Duty**

141.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

142.    To the extent it is determined that any Defendant did not owe or assume fiduciary duties directly to Plaintiffs or to Nikiski Partners, each such Defendant remains liable because it knowingly participated in the fiduciary breaches of the other Defendants.  By knowingly participating in those breaches, each Defendant became jointly and severally liable to disgorge the profits from the scheme  and to compensate Plaintiffs or Nikiski Partners for their damages.

**C.    Common Law Fraud and Fraudulent Inducement**

143.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

144.    Defendants made misrepresentations and failed to disclose information that they had a legal duty to disclose to Plaintiffs, knowing such misrepresentations and failures to disclose were

materially misleading, and intending that Plaintiffs rely upon the misrepresentations and failures to disclose. Plaintiffs relied or may be presumed to have relied upon Defendants' misrepresentations and failures to disclose and suffered damages as a proximate result. Each Defendant is jointly and severally liable for those damages.

### D.    Statutory Fraud

145.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

146.    In connection with a transaction involving stock in a corporation, Defendants made false representations of material fact to Plaintiffs and made false promises to Plaintiff with no intention of fulfilling those promises. Defendants made these false representations and promises knowingly and with the intent of inducing Plaintiffs to act. Plaintiffs relied on Defendants' false promises and representations and thereby suffered damages. Defendants are jointly and severally liable to Plaintiffs for those damages under Chapter 27 of the Texas Business & Commerce Code.

### E.    Securities Fraud in Violation of the Texas Blue Sky Laws

147.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

148.    The investments at issue constitute securities, and they were sold by means of written or oral communications that included untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The untrue statements and omissions were made for the purpose of inducing Plaintiffs to purchase the investments. Plaintiffs did not know, and had no way of knowing, of the misstatements and omissions. Thus, the investments were sold in violation of Tex. Rev. Civ. Stat. Ann. art. 58133(A)(2). Each Defendant was either a seller, and/or a person who

46447                                          36

directly or indirectly controlled a seller and/or a person who materially aided a seller in violating Tex. Rev. Civ. Stat. Ann. art. 58133(A)(2). Each Defendant is thus jointly and severally liable to Plaintiffs for securities fraud.

**F.     Breach of Contract**

149.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

150.    P.I.E. Corp. materially breached its contractual obligations to Plaintiffs set forth in the Partnership Agreement. Plaintiffs, as a direct and proximate result, has suffered actual damages.

151.    All conditions precedent have been performed or have occurred.

**G.     Investor Oppression**

152.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

153.    Defendants have acted wilfully and in bad faith towards Plaintiffs and in a way that denied Plaintiffs the benefits of his investments. Defendants' conduct has operated to substantially defeat Plaintiffs' legitimate and reasonable expectations. Defendants' conduct has been burdensome, harsh and wrongful, and it has lacked probity and fair dealing, to the great prejudice of Plaintiffs. Defendants' conduct constitutes investor oppression, which justifies an award of damages and an order requiring a buyout of Plaintiffs' interests at fair market value (after crediting Plaintiffs for the value that Defendants have tried to strip away through their acts of self-dealing and breaches of fiduciary duty).

**H.     Conversion**

154.    As described above, the Reformer was originally purchased in 1995 by P.I.E. Corp. using Nikiski funds invested by the Nikiski Investors. Because P.I.E. Corp. used Nikiski funds to

buy the Reformer, it necessarily follows that Nikiski or the Nikiski Investors owned the Reformer and had the right to immediate possession of the Reformer. To the extent that P.I.E. Corp. held legal title to the Reformer, it did so in its capacity as general partner of Nikiski and for the benefit of Nikiski and the Nikiski Investors.

155.    The Reformer was and is personal property subject to conversion.

156.    In February 1996, P.I.E. Corp., Phil Mulacek and CTI wrongfully exercised dominion and control over the Reformer in a manner inconsistent with the rights of Nikiski and the Nikiski Investors. They did so by doctoring the records to make it appear as if CTI had actually acquired the Reformer in February 1996, even though P.I.E. Corp. (for the benefit of Nikiski) had actually purchased it several months earlier, in 1995. Thus, CTI – without having paid for the Reformer – was given nominal title to it, in derogation of the rights of the Reformer's lawful owner (Nikiski and its investors). Thereafter, P.I.E. Corp., Mulacek and CTI continued their wrongful exercise of dominion and control over the Reformer by causing CTI, in November 1996, to contribute the Reformer to the InterOil venture in exchange for 5.1 million shares of stock and then diverting those 5.1 million shares to CTI (and ultimately from CTI to Mulacek).

157.    In November 1996 and in early 1997, InterOil, SP InterOil and EP InterOil wrongfully exercised dominion and control over the Reformer by accepting its conveyance from CTI, even though InterOil, Sp InterOil and EP InterOil knew that the Reformer was really owned by P.I.E. Corp. in its capacity as general partner of Nikiski and for the benefit of Nikiski and the Nikiski Investors.

158.    As a proximate result of these acts of conversion, Plaintiffs and Nikiski suffered injury and actual damages, for which they now sue.

46447                                          38

I.    **Theft Liability Act**

159.    As alleged above, Nikiski and/or the Nikiski Investors had a possessory right to the Reformer and were effectively its owners as soon as P.I.E. Corp. (acting as the general partner of Nikiski) acquired it in 1995 using funds contributed by the Nikiski Investors.

160.    In February 1996, Defendants P.I.E. Corp., Mulacek and CTI, in violation of Section 31.03 of the Texas Penal Code, unlawfully appropriated the Reformer with the intent to deprive Nikiski and/or the Nikiski Investors of the Reformer.  The appropriation of the Reformer was unlawful because it was without the effective consent of Nikiski and/or the Nikiski Investors.  The unlawful appropriation was accomplished by doctoring the records to make it appear as if CTI owned the Reformer, even though it had been actually purchased months before with Nikiski funds and for the benefit of Nikiski and the Nikiski Investors.

161.    In November 1996 and early 1997, InterOil, SP InterOil and EP InterOil, in violation of Section 31.03 of the Texas Penal Code, unlawfully appropriated the Reformer with the intent to deprive Nikiski and the Nikiski Investors of the Reformer.  These Defendants unlawfully appropriated the Reformer by accepting its conveyance from CTI, even though they knew that the Reformer was really owned by P.I.E. Corp. in its capacity as general partner of Nikiski and for the benefit of Nikiski and the Nikiski Investors.  This appropriation was unlawful because the Reformer was stolen and these Defendants accepted it knowing it was stolen by another.

162.    As a result of this theft, Nikiski and the Nikiski Investors suffered injuries and actual damages, for which they now sue.

### J.    Money Had and Received

163.    In exchange for conveying the Reformer to SP InterOil, Defendants Mulacek, P.I.E.

Corp. and CTI obtained 5.1 million shares of stock of SP InterOil and have since converted those

shares into common shares of InterOil and/or into cash.

164.    In equity and good conscience, the stock obtained in exchange for the Reformer

(and/or the cash into which that stock has been converted) belongs to Nikiski and/or Plaintiffs.

Plaintiffs and/or Nikiski, as a result of Defendants' retention of that stock and/or cash, have sustained

actual damages, for which they now sue.

### K.    Tortious Interference

165.    Nikiski and/or Plaintiffs, through Nikiski's general partner, had a valid contract to

acquire the Reformer that had either been partially or completely performed prior to February 1996.

In February 1996, CTI, Mulacek and P.I.E. Corp., with knowledge of that contract, willfully and

intentionally interfered with the contract by, among other things, doctoring the records to make it

appear as if CTI were the purchaser of the Reformer; causing nominal title to the Reformer to be

vested in CTI; and diverting away from Nikiski and the Nikiski Investors all of the financial benefits

from the subsequent resale of the Reformer.

166.    In November 1996 and early 1997, InterOil, SP InterOil and EP InterOil themselves

willfully and intentionally interfered with the contract to acquire the Reformer by, among other

things, paying to CTI the 5.1 million shares that constituted consideration for contribution of the

Reformer, even though they knew that Nikiski and/or the Nikiski Investors were the true owners of

the Reformer.

167.    The acts of interference described above proximately caused injury and actual damage

to Nikiski and/or Plaintiffs, for which they now sue.

46447                                            40

### L.    **Participatory Liability**

168.    Each Defendant named herein is liable for all of the above-described conduct that it committed or engaged in directly.  Each Defendant is also liable, jointly and severally, for all of the harm and damages alleged in this suit under various theories of participatory and vicarious liability, even as to conduct for which it was not the primary actor.

169.    First, each Defendant who was not a primary actor as to a particular act or omission is liable for assisting or encouraging the primary actor's tortious conduct because: (a) the primary actor committed a tort; (b) each Defendant had knowledge that the primary actor's conduct constituted a tort; (c) each Defendant had the intent to assist the primary actor in committing the tort; (d) each Defendant gave the primary actor assistance or encouragement; and (e) each Defendants' assistance or encouragement was a substantial factor in causing the tort.

170.    Second, each Defendant who was not a primary actor as to a particular act or omission is also liable for assisting and participating in the primary actor's tortious conduct because: (a) the primary actor's activity accomplished a tortious result; (b) each Defendant provided substantial assistance to the primary actor in accomplishing the tortious result; (c) each Defendant engaged in its own conduct, separate from the primary actor's conduct, that was a breach of duty to Plaintiffs and/or Nikiski; and (d) each Defendants' participation was a substantial factor in causing the tort.

171.    Third, each Defendant who was not a primary actor as to a particular act or omission is also liable under the theory of concert of action because: (a) the primary actor committed intentional torts that were likely to and did cause certain harm to a large number of people; (b) each Defendant agreed, explicitly or implicitly, to cooperate in the plan to accomplish the resulting harm; (c) each Defendant itself engaged in tortious conduct as part of the plan; and (d) the tortious conduct caused injury to Plaintiffs and/or Nikiski.

172.     Fourth, each Defendant who was not a primary actor as to a particular act or omission is also liable under a conspiracy theory because: (a) each Defendant was a member of a combination of two or more persons; (b) the members of that combination had a meeting of the minds on the object of their combination and/or their course of action; (c) the object of the combination was to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means; (d) one or more of the members of the combination committed an unlawful, overt act to further the object or course of action; and (e) Plaintiffs and/or Nikiski suffered injury as a proximate result of the wrongful acts committed in furtherance of the combination.

173.     Fifth, each Defendant who was not a primary actor as to a particular act or omission is also liable under a joint enterprise theory because: (a) each Defendant was engaged in a joint enterprise; (b) each Defendant was party to an express or implied agreement as to the common purpose to be carried out by the joint enterprise; (c) each Defendant had a community of pecuniary interest in that common purpose; (d) each Defendant had an equal right to direct and control the enterprise; and (e) one or more members of the joint enterprise committed torts against Plaintiff and/or Nikiski while acting in the scope of the joint enterprise.

174.     Sixth, each Defendant who is not a primary actor as to a particular act or omission is also liable under a ratification theory because: (a) Plaintiffs and/or Nikiski were injured by acts and omissions that the primary actors committed on behalf of and for the benefit of each Defendant; (b) each Defendant approved the wrongful acts of the primary actors by word, act or conduct after acquiring full knowledge of the acts; and (c) each Defendants' approval was given with the intention of giving validity to the wrongful acts and omissions of the primary actors.

46447                                    42

**M.    Malice/Punitive Damages**

175.    Defendants have acted with "malice" as that term is defined in Texas law.  Plaintiffs are thus entitled to recover punitive damages from Defendants.  Because Defendants are liable for knowing and intentional conduct that would constitute felony theft under Chapter 31 of the Texas Penal Code, the limitations on the amount of exemplary damages set forth in Chapter 41 of the Texas Civil Procedure & Remedies Code do not apply.

**N.    Constructive Trust**

176.    As alleged above, title to the Reformer was wrongfully placed in the name of CTI and then CTI was wrongfully allowed to convey the Reformer to InterOil (or its affiliates).  InterOil and its affiliates accepted the Reformer with knowledge of the fraud and breaches of fiduciary duty through which it was, in essence, stolen from Nikiski Partners and/or Plaintiffs.  InterOil and its affiliates would be unjustly enriched if they were allowed to retain title and possession of the Reformer under such circumstances.   And, any Defendant who obtained any portion of the consideration (5.1 million shares of stock) granted to CTI in the Reformer transaction would be unjustly enriched if it were allowed to retain any portion of such shares. The Court, therefore, should impose a constructive trust for the benefit of Plaintiffs and/or Nikiski on the Reformer and on all of the 5.1 million shares of stock currently in the possession or under the custody or control of any Defendant.

**O.    Attorneys' Fees and Reasonable Expenses**

177.    All of the allegations contained in the foregoing paragraphs are re-alleged and incorporated herein as though they were fully set forth.

178.    Plaintiffs are entitled to recover from Defendants reasonable expenses, including reasonable attorney's fees, pursuant to Texas Civil Practice & Remedies Code Chapter 38, the Texas

46447                                                                43

Revised Limited Partnership Act, Art. 6132a-1 § 10.05, and Chapter 27 of the Texas Business and Commerce Code.

## IX. <u>Requested Relief</u>

179.   Plaintiffs seek the following relief:

- Declaratory and/or injunctive relief requiring Defendants to allow Plaintiffs to redeem and convert all of their existing Nikiski units into unrestricted shares of InterOil stock.

- Judgment requiring Defendants to disgorge all of the profits flowing from the breaches of duty outlined herein.

- Actual damages in an amount far in excess of the minimum jurisdictional limits of the Court.

- An order requiring Defendants to buy back Plaintiffs' interests in Nikiski Partners at fair market value (after crediting Plaintiffs for the wrongful dilution of their interests and the diminution in value suffered from the wrongful usurpation of partnership opportunities and the other breaches alleged above).

- Punitive damages in an amount deemed appropriate by the jury.

- Expenses, court costs and reasonable and necessary attorneys' fees.

- To the extent any claims alleged herein are deemed to belong to Nikiski Partners, a judgment in favor of Nikiski Partners for some or all of the relief outlined above.

- A declaratory judgment that the purported amendment to the Nikiski Partnership Agreement that Defendants induced certain investors to sign in May 2008 is void, unenforceable and invalid.

- The imposition, for the benefit of Plaintiffs and/or Nikiski Partners, of a constructive trust on the Reformer and/or on the 5.1 million CTI shares (or any portion of them) currently in the custody, possession or control of any Defendant.

## X. Discovery Rule

180.    To the extent that any party pleads the statute of limitations as a defense, Plaintiffs

hereby assert the "discovery rule" as pronounced by the Texas Supreme Court in *Willis v. Maverick*,

760 S.W.2d 642 (Tex. 1988).  This suit has been filed within two years of Plaintiffs' knowledge of

such facts as would lead a reasonably prudent person to discover the Defendants' wrongful acts.

## XI. Fraudulent Concealment

181.    Defendants acted fraudulently to conceal from Plaintiffs the facts giving rise to the

cause of action asserted herein.

## XII. Adverse Domination

182.    All statutes of limitations on any claims that are deemed to be derivative in nature

have been tolled under the adverse domination doctrine.

## XIII. Conditions Precedent

183.    Any conditions precedent to Plaintiffs' rights to recover have been performed or have

occurred.

## XIV. Jury Demand

184.    Plaintiffs hereby demand a jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to

appear and answer herein and that, upon trial, Plaintiffs have judgment against Defendants, jointly

and severally, for the relief outlined above; pre-judgment and post-judgment interest; and such

further relief to which Plaintiffs show themselves justly entitled.  In addition, to the extent any of the

causes of action herein are deemed to belong to Nikiski Partners, Plaintiff Todd Peters seeks

judgment, in the name of Nikiski Partners, for all relief to which Nikiski Partners is justly entitled.

Respectfully submitted,

NICKENS KEETON LAWLESS
  FARRELL & FLACK LLP

By: _____
      Thomas M. Farrell
      State Bar No. 06839250
      Bradley W. Hoover
      State Bar No. 09965700
      600 Travis St., Ste. 7500
      Houston, TX 77002
      (713) 571-9191
      (713) 571-9652 (Fax)

ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

M.A. Mills
State Bar No. 14161000
The Mills Law Firm
2100 West Loop South
Suite 1100
Houston, Texas 77027

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to the following counsel of record by hand delivery on this _22ND_ day of September, 2009:

William C. Boyd
S. Scott Boyd
Patterson, Boyd & Lowery, PC
2101 Louisiana St.
Houston, Texas 77002

Joe C. Holzer
Andrews Kurth LLP
600 Travis St., Suite 4200
Houston, Texas 77002

Michael T. Powell
Kirk L. Worley
Yasser A. Madriz
Haynes and Boone, LLP
1221 McKinney St., Suite. 2100
Houston, Texas 77010

_____
Thomas M. Farrell

46447