IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NIKISKI PARTNERS, LTD., | § | Case No. 09-39332 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

## EMERGENCY MOTION TO DISMISS
## DEBTOR'S BAD-FAITH CHAPTER 11 PETITION

**IF YOU WANT A HEARING, YOU MUST REQUEST ONE IN WRITING AND YOU MUST RESPOND SPECIFICALLY TO EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.**

**IF A PARTY REQUESTS EMERGENCY CONSIDERATION, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER. IF THE COURT ALLOWS A SHORTER RESPONSE TIME THAN TWENTY DAYS, YOU MUST RESPOND WITHIN THAT TIME. IF THE COURT SETS AN EMERGENCY HEARING BEFORE THE RESPONSE TIME WILL EXPIRE, ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS. IF AN EMERGENCY HEARING IS NOT SET, YOU MUST RESPOND BEFORE THE RESPONSE TIME EXPIRES.**

**THERE WILL BE A HEARING ON THIS MOTION ON FRIDAY, DECEMBER 18, 2009 AT 11:00 A.M. BEFORE THE HONORABLE MARVIN ISGUR IN THE UNITED STATES BANKRUPTCY COURT, 515 RUSK, COURTROOM 404, HOUSTON, TEXAS 77002.**

TO THE HONORABLE UNITED STATES BANKRUPTCY COURT:

Todd Peters; Lloyd Tisdale and LTPT, LLC; Jack Farris; Ken Walker; Mohammad Shafiq;

Howell Wiesner; Chandrakant Patel; Rasik & Pushpa Patel; A. Dearl Dotson and the A. Dearl

Dotson Family LP; John Crawford and Crawford Oil Company; Benjamin Hughes, Judith Hughes

and B&J Hughes Ventures, Ltd.; David Graumlich; Fred and Joan Brown; Molibari International and its managing member, Gordon Glade; Paul Scott Hughes and Cathy Hughes; Don Edd Wiesner; and James Jordan and the James Jordan Group (collectively, the "Nikiski Investors" or "Movants") file this Emergency Motion to Dismiss Debtor's Bad-Faith Chapter 11 Petition and respectfully show as follows:

## I. INTRODUCTION

1.      On Friday, December 4, 2009, Nikiski Partners, Ltd. ("Nikiski Partners" or the "Alleged Debtor") filed a voluntary petition (the "Petition") for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Petition was filed in a transparent attempt to derail state-court litigation that has been ongoing in Montgomery County, Texas, since 2005.[1] The timing of the Petition was driven by the desire of those who control the Alleged Debtor to stop a deposition that was scheduled, pursuant to court order, to take place in Chicago, Illinois, on December 7, 2009 (the Monday after the Friday filing of the Petition).

3.      The objective facts, detailed below, reveal that the Petition could not possibly have been filed in good faith. The Petition, in fact, presents the quintessential case for dismissal of a bad-faith bankruptcy filing. The badges of bad faith that surround this filing include:

- The Alleged Debtor is a single-asset entity that does nothing but passively hold investment units that are ultimately convertible into shares of a public company.

- Since 1996, the Alleged Debtor has maintained its existence for the sole purpose of passively holding these investment units.

---

[1] *Peters v. Mulacek, et al.*, Cause No. 05-04-03592-CV, in the 284th Judicial District Court of Montgomery County, Texas ("*Peters*" or the "*Peters* case").

- Since 1996, the Alleged Debtor has not been engaged in any operating or active business pursuits of any kind.

- The Alleged Debtor currently has no employees.  It has never employed anyone since its creation in 1994.

- The Alleged Debtor has no cash flow and no ongoing expenses beyond the minimal accounting and legal fees associated with maintaining its existence and sending K-1s to its owners.

- The Alleged Debtor has no secured creditors.

- The Alleged Debtor has only two unsecured creditors (a lawyer and an accountant).

- The Alleged Debtor's alleged unsecured debt totals only $5,751.25.

- The Alleged Debtor's asset (the investment units it passively holds for its owners) is worth well in excess of $50 million.

- The Alleged Debtor is nowhere near insolvent and is under no financial distress.

- The Alleged Debtor is controlled and managed by parties who are defendants in the *Peters* case, with no independent or outside decision makers.

- The ongoing *Peters* case could result in a money judgment <u>in favor</u> of the Alleged Debtor, but it could not possibly result in a money judgment <u>against</u> the Alleged Debtor.

- The only parties who could potentially suffer a money judgment <u>against</u> them in the *Peters* case are not parties to this or any other bankruptcy case.

- Because the Alleged Debtor faces no litigation risk and otherwise has no creditors to speak of or any need to reorganize, this case will further no valid bankruptcy purpose.

4.     For these and the additional reasons set forth below, and pursuant to Section 1112(b) of the Bankruptcy Code, the Petition should be dismissed immediately and the *Peters* state-court litigation should be returned to the 284th Judicial District Court of Montgomery County, Texas, where it has been proceeding since 2005.

## II. **PROCEDURAL BACKGROUND**

A.     *Procedural Background of this Case*

5.     As noted above, the Alleged Debtor filed the Petition on December 4, 2009.

6.     Contemporaneously, the Alleged Debtor purported to remove the *Peters* case from state court to the United States District Court for the Southern District of Texas. The only basis asserted for federal jurisdiction is that *Peters* is "related to" the Alleged Debtor's Petition.

7.     On December 4, 2009, the Alleged Debtor also filed an Emergency Motion for the Appointment of an Examiner With Certain Expanded Powers (the "Examiner Motion"), along with a request that the Examiner Motion be heard on an expedited basis.

8.     This Court has scheduled a hearing on the Examiner Motion for December 18, 2009, at 11:00 a.m. The Clerk has instructed the undersigned to self-calendar this Motion to Dismiss for hearing for the same date and time.

B.     *Procedural Background of the* **Peters** *State-Court Case*

9.     The *Peters* case was filed in Montgomery County on April 21, 2005, by Todd Peters, an original investor in Nikiski Partners. His parents (Mal and Lynette Peters), who were also original investors, joined him as plaintiffs.[2]

10.     The lawsuit was initially filed because the general partner of Nikiski Partners had done a poor job of keeping the limited partners informed about the status of their investments. The primary focus of the case, as originally filed, was to obtain access to the partnership books and records of Nikiski Partners. Because of that focus, Nikiski Partners itself was of course a necessary party to the case. No damages were sought from Nikiski Partners.

---

[2] For reasons not relevant here, Mal and Lynette Peters were later dropped from the suit and are not now parties to it.

48156                                                  4

11.    An initial round of discovery in the *Peters* case revealed evidence of serious wrongdoing by the general partner of Nikiski Partners and others.  The *Peters* petition was then amended to describe that wrongdoing and to assert claims for damages and disgorgement based on egregious breaches of fiduciary duty, fraud, and other wrongs.  As set forth in more detail in the factual background section of this Motion, the allegations of wrongdoing relate, in significant part, to the creation of a public company called InterOil Corporation ("InterOil") and the misappropriation of shares in InterOil.

12.    Peters recognized that some of the causes of action in the amended petition could be potentially characterized as "derivative" claims – i.e., claims for which damages were suffered in the first instance by Nikiski Partners, the partnership, and that then flowed indirectly to the limited partners by virtue of their ownership interests in Nikiski Partners.  To address this potential, Todd Peters asserted the amended claims both individually and, alternatively, as derivative claims.[3] Because of these alternative allegations, Nikiski Partners remained a party to the lawsuit as the entity that would benefit from any recovery on claims that the court determined to be derivative in nature.

13.    Nikiski Partners has thus been included as a party to the *Peters* case for two reasons.  First, its presence was required on the initial claims seeking access to its books and records.  Second, as made explicit in the Tenth Amended Petition, Nikiski Partners is effectively the plaintiff on any claim that is deemed to be derivative in nature: "As to any cause of action that is deemed to be derivative, Nikiski Partners (although nominally sued herein as a defendant) would be the real party

---

[3] Article 10 of the Texas Revised Limited Partnership Act authorizes a limited partner of a Texas limited partnership to bring derivative claims on behalf of the partnership.  Todd Peters made all of the allegations required by Article 10 and unquestionably had and has standing to assert derivative claims on behalf of Nikiski Partners.

in interest and would effectively be the plaintiff." (Tenth Amended Pet. at ¶ 41.) No damages are being sought from Nikiski Partners.

14.      After the *Peters* lawsuit was amended (and after the case was stayed for a period of time for reasons not now relevant), discovery proceeded and the parties were preparing for a September 21, 2009 trial date.

15.      In June 2009, certain defendants filed a motion for summary judgment in which they asked the court to determine that all of Peters' claims are derivative in nature and that they should not go forward because a majority of limited partners had (at the request of Phil Mulacek) signed a release (in May or June 2008) that purported to ratify retroactively all prior wrongdoing by the defendants.

16.      Prior to the hearing on that motion, Peters deposed a number of the limited partners who had signed the purported release and discovered that Phil Mulacek had induced them to sign it through misrepresentations and further breaches of fiduciary duties. Once they learned (through the deposition process) that they had been misled, many of those limited partners rescinded the fraudulently-induced release and joined the lawsuit as plaintiffs. The *Peters* petition was then amended to add the new plaintiffs, all of whom (with Todd Peters, the original plaintiff) are Movants here. Collectively, Movants represent 46.1 percent of the limited-partner interest in Nikiski Partners.[4]

17.      As a result of the joinder of additional limited partners as plaintiffs, the September 21, 2009 trial date was continued. The state court has indicated its intent to try the case starting on

---

[4] Phil Mulacek and his family own 13.23 percent of the limited-partner interest in Nikiski. Considering Mulacek's 13.23 percent and the 46.1 percent owned by plaintiffs in the *Peters* case, there is only 40.67 percent in interest that is not controlled by Mulacek and that elected not to participate in the state-court litigation.

48156                                                    6

May 3, 2010. Since the continuance, the defendants have been in the process of deposing the new plaintiffs in the *Peters* case. And the plaintiffs have been trying to schedule the few remaining depositions that they require before trial.

18.    In addition, the defendants have been trying, through settlements, to reduce their overall exposure in the *Peters* case. Specifically, they arranged for a settlement offer to be made to all limited partners (those who were named plaintiffs and those who were not) pursuant to which each limited partner, upon executing a full release of all claims, could exchange each restricted unit of Nikiski Partners for 1.25 shares of InterOil stock.[5]  In other words, if the limited partners were willing to release any lawsuit claims, they could obtain the removal of all restrictions on their units and a premium of 0.25 additional shares of InterOil stock for each Nikiski unit. As an example, a limited partner who owned 10,000 Nikiski units could receive 12,500 shares of InterOil.

19.    All of the Nikiski limited partners who are plaintiffs in the *Peters* case rejected the offer. Most of the limited partners who are not plaintiffs in the *Peters* case purported to accept the offer and have apparently already received 1.25 InterOil shares for each of their Nikiski units. As a result, assuming that the settlement offers were validly consummated,[6] very few original limited partners (other than the plaintiffs in *Peters*) remain as owners of Nikiski Partners. Nikiski Partners is essentially now owned only by Movants (who desire the *Peters* case to go forward) and by Mulacek and Mulacek-controlled entities (who are defendants in the *Peters* case and who obviously don't want the case to go forward, but have a crippling conflict of interest on that issue).

---

[5] The offer was purportedly made by a third party, but that entity is closely aligned with Phil Mulacek. The offer was communicated and administered by Phil Mulacek's counsel.

[6] There remains a serious issue over whether the transfer of Nikiski units contemplated by the offer was validly accomplished, and Movants do not concede that it was.

20.      When the Petition and the Examiner Motion were filed, the deposition of Ronald Mulacek (one of the principals of the Alleged Debtor's general partner) was set to take place on December 7, 2009, in Chicago, Illinois. The Nikiski Investors have been trying to take this deposition for well over a year. Ronald Mulacek has been trying to avoid the deposition through a variety of tactics, including hiring a lawyer to negotiate a deposition date and then firing that lawyer just a day or two before the negotiated date. The Nikiski Investors were forced to hire local counsel in Illinois (where Ronald Mulacek lives) and to incur thousands of dollars in fees on multiple hearings in Illinois to obtain a firm, no-excuses date for the deposition. These hearings resulted in an order from the Illinois court that Ronald Mulacek finally appear for his deposition on December 7, 2009.

21.      The filing of the Petition was supposedly authorized by action taken by the managers of the Alleged Debtor's general partner on November 24, 2009. (*See* Minutes of the Joint Meeting of the Managers and Members of Petroleum Independent & Exploration, LLC, attached to and filed with the Petition.) Ronald Mulacek, the witness who has been trying to avoid his deposition, is one of the three managers (along with his son and his daughter in law) who authorized the filing of the Petition. Even though the Alleged Debtor claims that an "emergency" exists, the Alleged Debtor did not file the Petition and Examiner Motion until ten days after the authorizing resolution was signed – i.e., after the close of business on December 4, 2009. The filing came at literally the last possible minute – with only two weekend days before the scheduled deposition – to have its desired effect of causing the cancellation of the deposition of Ronald Mulacek.[7]

---

[7] Despite the claim that an "emergency" exists and that an Examiner must immediately be appointed to deal with the state-court litigation, the defendants in the *Peters* case (including the Alleged Debtor's general partner, which authorized the bankruptcy filing) took 2 depositions of their own in the ten-day period between the authorization of the bankruptcy filing and its actual filing.

22.     Counsel for the Nikiski Investors – who are Movants here and plaintiffs in the *Peters* case – were notified of the bankruptcy filing at 6:32 p.m. on Friday, December 4, 2009 – about 36 hours before their scheduled flight to Chicago for the deposition of Ronald Mulacek.

### III.  FACTUAL BACKGROUND

23.     A somewhat detailed history of the Alleged Debtor and its principals is necessary to a full understanding of this Motion and the improper motives behind the Petition.

### A.     *The Formation of Nikiski Partners and InterOil*

24.     In 1994, Chevron owned a decommissioned modular oil refinery (the "Crude Unit") located in Alaska.  Chevron offered the Crude Unit for sale, with the requirement that the buyer remove it from Chevron's site.

25.     At the time, Phil Mulacek operated a small-time oil and gas company call Petroleum Independent & Exploration Corporation ("PIE Corp.").  At all relevant times, PIE Corp. has been owned by Phil Mulacek (and/or members of his family).  Its only directors have been Phil Mulacek; Ronald Mulacek (Phil's father); and Kathleen Mulacek (Phil's wife).[8]

26.     Phil Mulacek and PIE Corp. wanted to buy the Crude Unit from Chevron, but they lacked the funds to do so.

27.     Phil Mulacek and PIE Corp. created Nikiski Partners,[9] the Alleged Debtor, as the vehicle through which to raise money for the purchase of the Crude Unit.  PIE Corp. was installed

---

[8] In 2008, PIE Corp. was converted from corporate form into an LLC.  References herein to PIE Corp. include the successor LLC.

[9] Nikiski Partners was originally named "PIE Refinery, Ltd."  It changed its name to Nikiski Partners in 1994.

as the general partner. Phil Mulacek and PIE Corp. raised $2 million through Nikiski Partners in 1994 and used a significant portion of those funds to buy the Crude Unit.

28.     Each of the Movants was an original investor in Nikiski Partners and currently is a limited partner in Nikiski Partners. Collectively, Movants represent 46.1 % of the limited-partner interest in Nikiski Partners.[10]

29.     Phil Mulacek's business plan for the Crude Unit was either to flip it to a third-party in hopes of a quick profit on resale or to dismantle it and move it to a "host country," where it could be reassembled and operated. Even before closing of the purchase from Chevron, Phil Mulacek had identified Papua New Guinea as a potential "host country."

30.     Phil Mulacek knew, from the outset, that the viability of the "host country" option depended on the location and acquisition of a separate piece of equipment – a catalytic reformer – that the Crude Unit did not then have. Without a catalytic reformer, the Crude Unit could not produce unleaded gasoline. No "host country" was likely to accept the Crude Unit without that capability. If the "host country"option were to be pursued, Nikiski Partners would have to find a suitable catalytic reformer.

31.     Soon after the acquisition of the Crude Unit, the "host country" option – specifically, the Papua New Guinea option – emerged as Phil Mulacek's preferred path.

32.     From 1994 through early 1997, Phil Mulacek and PIE Corp. set about to obtain additional financing and to create new corporate structures through which to pursue the Papua New

---

[10] In light of the settlement transaction discussed in Paragraphs 18-19, above, Movants now constitute the only remaining original investors in Nikiski Partners who are not family members or affiliates of Mulacek.

Guinea option.  Phil Mulacek and PIE Corp. caused the following transactions, among others, to occur:

- Ownership of the Crude Unit was transferred from Nikiski Partners to a new entity controlled by Phil Mulacek and named PIE Group, LLC.

- In exchange, Nikiski Partners obtained units in PIE Group, LLC.[11]

- PIE Group, LLC in turn transferred the Crude Unit to a new group of companies – InterOil Corporation and its subsidiaries.

- In exchange, PIE Group, LLC received shares in the InterOil venture.  Those shares are ultimately convertible into shares of the InterOil parent company.

- The InterOil parent company merged with a shell company traded on the Canadian Dealer Network and became a public company.[12]

- InterOil Corporation thereafter relocated the Crude Unit to Papua New Guinea and put it into operation there.  InterOil also pursued various other oil-and-gas activities in Papua New Guinea.

**B.**     *The Wrongdoing by Phil Mulacek and His Cronies*

33.     The Nikiski Investors were told that these various re-structuring activities were routine matters necessary for "tax and business planning purposes."  They were also told that the re-structuring and related activities would be accomplished to "maintain project control with Nikiski Partners" and "would protect and enhance the original investment of the Nikiski Partners."

---

[11] These entities are structured so that each unit of ownership in Nikiski Partners is convertible (through PIE Group, LLC) into a share of InterOil Corporation, the public company.  Thus, an investor who owns 10,000 units of Nikiski Partners will someday receive 10,000 shares of InterOil Corporation.  The timing of the conversion – and the discriminatory restrictions placed on conversion rights – are among the matters at issue in the *Peters* case.

[12] Since creation of InterOil Corporation in 1997, its shares have been continuously listed on at least one public stock exchange.  Currently, InterOil shares are listed on the New York Stock Exchange under the ticker symbol IOC.

34.     As a result of these transactions, Nikiski Partners was rendered a purely passive vehicle.  Since 1996, its only purpose has been to hold units in PIE Group, LLC that are ultimately convertible into shares of InterOil Corporation, the public company.  Nikiski Partners does not engage in any other business or business endeavor.  It has no employees or cash flow.  Nikiski Partners has no expenses, no debts, and no creditors beyond those minimal expenses associated with its one and only activity – sending K-1s to its owners.

35.     The creation of InterOil as a public entity was not by itself wrongful.  If the transactions described above had really been accomplished for routine "tax and business" purposes, then the Nikiski Investors would have no complaint.  The truth – which was concealed from the Nikiski Investors for many years – is that Phil Mulacek and PIE Corp. secretly used the re-structuring and related activities to enrich themselves (and the Mulacek family) at the expense of the Nikiski Investors.

36.     The many breaches of fiduciary duty and fraudulent misrepresentations and omissions committed by Phil Mulacek and PIE Corp. (and others) are detailed in the Tenth Amended Petition in the *Peters* case (which is incorporated by reference) and will not repeated here.  That said, one egregious example merits discussion.

37.     Knowing that a catalytic reformer was essential to the plan to relocate the Crude Unit to Papua New Guinea, Phil Mulacek and PIE Corp., in **1995**, searched for and found a used reformer (the "Cyril Reformer") that was for sale.  PIE Corp. (using, on information and belief, funds contributed by the original investors in Nikiski Partners[13]) purchased the Cyril Reformer in the

---

[13] The allegation as to the source of the funds is made on information and belief because PIE Corp., despite orders to compel and for sanctions in the *Peters* case, has <u>never</u> produced the documents showing who actually funded the purchase of the Cyril Reformer.

**summer or fall of 1995** for approximately $250,000. Then, in **February 1996**, when the plan to create a public company was being formulated, Phil Mulacek and PIE Corp. falsified records to make it appear as if a company called Commodities Trading International ("CTI") had purchased the Cyril Reformer. Later, in **November 1996**, Phil Mulacek caused CTI to contribute the Cyril Reformer to the InterOil venture at a value of over $15 million, even though it had been purchased just a few months earlier for only $250,000. Based on that valuation, CTI was issued over 5.1 million unrestricted, freely tradeable shares of InterOil Corporation, the public company.

38.    The obvious question arises: Why would Phil Mulacek divert to CTI the opportunity to contribute the Cyril Reformer to the InterOil venture at a value that represented a 6,000 percent increase over its cost? The answer, which was not known to most of the Nikiski Investors until **2009,** is that CTI is hardly the unaffiliated third-party that Phil Mulacek made it appear to be. Rather, CTI was secretly owned by Phil Mulacek's grandfather and controlled by Phil Mulacek. Phil Mulacek and his family received or controlled the 5.1 million shares issued to CTI, in direct derogation of the rights of the Nikiski Investors on whose behalf the Cyril Reformer was originally acquired in 1995.[14]

39.    To make matters worse, the 5.1 million shares that were wrongfully diverted to CTI were freely tradeable on a public market on the day they were issued. While CTI was free to liquidate its shares, Phil Mulacek and those acting in concert with him have purported – **for over a decade** – to restrict the ability of the Nikiski Investors to convert their units into freely tradeable shares. As detailed in the Tenth Amended Petition, the discriminatory application of such restrictions – and the

---

[14] Phil Mulacek and PIE Corp. breached fiduciary and other duties in connection with the Reformer transaction whether or not the Reformer was really worth $15 million. If it was worth $15 million, Phil Mulacek and PIE Corp. wrongfully diverted to CTI the partnership opportunity to convert a $250,000 investment into a $15 million value. If the Reformer was not worth $15 million, it was a breach of fiduciary duty to overvalue it for Phil Mulacek's benefit.

undisclosed preferential treatment afforded to Phil Mulacek and his family – constitute further breaches of fiduciary duty. These are among the wrongs for which Movants seek redress in the *Peters* case.

### C.   *The Petition Will Serve No Valid Bankruptcy Purpose*

40.     As the foregoing makes clear, the *Peters* case involves serious issues that, until December 4, 2009, were being actively litigated in state court.

41.     Since July 2009 (when several additional limited partners joined the suit as plaintiffs), there has been no material change or development in the *Peters* case. Rather, the case has simply been proceeding towards trial. The Court has indicated its intent to try the case on May 3, 2010.

42.     What, then, occurred in late November or early December to necessitate or justify a bankruptcy filing by Nikiski Partners, an entity against which no money judgment is sought in the *Peters* case? What is the "emergency"?

43.     The only circumstance that could be perceived as an "emergency" by Phil Mulacek and his family is the fact that Ronald Mulacek had been ordered by the Illinois Court to appear for his deposition on December 7, 2009. That "emergency" obviously provides no basis for a bankruptcy filing.

44.     What, then, is the valid bankruptcy purpose to be served by this case? Nikiski is a single-asset, passive investment vehicle that is under no financial distress, has no significant creditors, has no employees or ongoing business activities, and nothing to reorganize. Nikiski Partners, moreover, is under no litigation threat, because no recovery is sought <u>against</u> it in the *Peters* case.

45.     Any concern that the *Peters* case might have an adverse financial impact on <u>InterOil</u> obviously does <u>not</u> present a valid reason for <u>Nikiski Partners</u> to seek bankruptcy protection. InterOil

48156                                                      14

is not a party to this case. If InterOil thinks it needs bankruptcy protection, then InterOil can make its own decisions about filing for relief.

46.     There is thus <u>no</u> valid bankruptcy purpose to be served by this case: there are essentially two groups of constituents now involved with Nikiski Partners – the plaintiffs in the *Peters* case (46.1 percent in interest) and the Mulacek-controlled limited partners. One group wants the *Peters* case to proceed; and the other does not. But, the group that wishes to halt the litigation is comprised of the defendants in the case and thus has an inherent conflict of interest. It would indeed be a perversion of the judicial system if the defendants in a potential derivative case could halt the litigation against them by causing the putative derivative plaintiff to file for bankruptcy protection, even though that derivative plaintiff has no real creditors, and no independent need for the protection of bankruptcy.

47.     This is essentially a two-party dispute (Movants v. the Mulacek-controlled parties) and it has no business being in bankruptcy court. Rather, it should be resolved in the state court that is already intimately familiar with it.

## IV.  <u>GROUNDS FOR DISMISSAL</u>

48.     A bankruptcy petition must be filed in good faith. *See, e.g., Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068 (5th Cir. 1986). As the Fifth Circuit has made clear:

> Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.
>
> Such a standard furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the

48156                                    15

jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (i.e., avoidance of liens, discharge of debts, marshaling and turnover of assets) available only to those debtors and creditors with "clean hands."

*Little Creek Dev. Co.,* 779 F.2d at 1071-72 (citations omitted); *see also In The Matter of Elmwood*

*Dev. Co.*, 964 F.2d 508, 509-513 (5th Cir. 1992).

49.     A petition filed in bad faith can and should be dismissed under Section 1112(b) of the

Bankruptcy Code. *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3rd Cir. 2004). The

"burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *Id.*

50.     The ultimate issue in determining whether a bankruptcy petition is filed in good faith

is whether the petition will serve a valid bankruptcy purpose; if the debtor "has no need to rehabilitate

or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed,"

and should be dismissed. *In re Integrated Telecom Express*, 384 F.3d at 122.

51.     The debtor's ability to meet its burden of good faith depends on a "conglomerate of

factors rather than on any single datum." *Little Creek*, 779 F.2d at 1072. The following are among

the (non-exclusive) badges of bad faith that are often the hallmarks of bad-faith filings:

> The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals.

*Little Creek*, 779 F.2d at 1073.

52.     As indicated in *Little Creek*, these badges of bad faith can justify the dismissal of a bankruptcy case even where the debtor unquestionably is in financial distress and has debts that it cannot pay. *Id.*

53.     Here, many of the *Little Creek* factors are unquestionably present – single-asset entity; no employees; no cash flow; few, if any, unsecured creditors; nothing to reorganize; and no basis for a reorganization plan.  In addition, there is another compelling factor: Nikiski Partners is in no financial distress whatsoever – it has over $50 million in assets, no debts to speak of, and no need for any ongoing cash flow of any kind.  *See, e.g., Integrated Telecom*, 384 F.3d at 122 (while the Bankruptcy Code may not have an express insolvency requirement, a would-be debtor must be under some financial distress; solvent debtors with no need to reorganize or rehabilitate cannot seek bankruptcy protection).  Additionally, courts have held that where a debtor is engaged in what is essentially a two-party dispute and files a bankruptcy in an attempt to avoid the consequences of foreclosure, the Chapter 11 petition has been filed in bad faith and should be dismissed.  *See In re Starmark Clinics, LP*, 388 B.R. 729, 736 (Bankr. S.D. Tex. 2008).

54.     The conclusion is thus inescapable: the petition was not filed for a valid bankruptcy purpose, but rather to obtain a tactical advantage in ongoing state court litigation.  The desire to postpone Ronald Mulacek's deposition is not a valid bankruptcy purpose.  Neither is the desire to shop for a forum that is perceived to be more favorable on the question of whether the claims in the *Peters* case are derivative and should be allowed to proceed.  The state court is perfectly able to decide those questions – and in fact has already been asked to decide them.  Bankruptcy protection cannot and should not be used as a means to interfere with the state court's resolution of these issues.

55.   A bankruptcy filing made for the purpose of obtaining federal jurisdiction over pending litigation, where the debtor is not in financial distress and has no need to reorganize, is by definition a bad-faith filing. *See, e.g.*, *In re Premier Automotive Services, Inc.,* 492 F.3d 274, 280-81 (4th Cir. 2007); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000); *In re SGL Carbon Corp.,* 200 F.3d 154, 167 (3rd Cir. 1999); *In re Local Union 722*, 414 B.R. 443, 450 (Bankr. N.D. Ill. 2009); *Dunes Hotel v. Hyatt Corp.*, 245 B. R. 492, 511-12 (D.S.C. 2000); *In re Gooding,* 234 B. R. 157, 158-59 (Bankr. M.D. Fla. 1999); *In re Long Bay Dunes Homeowners Assoc.*, 246 B.R. 801, 805-06 (Bankr. S. Car. 1999); *In re Argus Group*, 206 B. R. 757, 765-67 (E.D. Pa. 1997); *In re Purpura*, 170 B.R. 202, 207 (Bankr. E.D. N.Y. 1994).

## V.   **CONCLUSION**

56.   For all of the foregoing reasons and those to be presented at the hearing on this Motion, the Alleged Debtor cannot meet its burden to show that the petition was filed in good faith. Under Section 1112(b) of the Bankruptcy Code, the Petition should be dismissed with prejudice.

Respectfully submitted,

NICKENS KEETON LAWLESS
FARRELL & FLACK LLP

By:       */s/ Thomas M. Farrell*
          Thomas M. Farrell
          State Bar No. 06839250
          Bradley W. Hoover
          State Bar No. 09965700
          600 Travis St., Ste. 7500
          Houston, TX 77002
          (713) 571-9191
          (713) 571-9652 (Fax)

ATTORNEYS FOR MOVANTS

48156                                   18

OF COUNSEL:

M.A. Mills
State Bar No. 14161000
The Mills Law Firm
2100 West Loop South, Suite 1100
Houston, Texas 77027

Judith Ross
Eric Soderlund
Baker Botts LP
2001 Ross Avenue
Dallas, Texas 75201-2980
(214) 953-6500

As Bankruptcy Counsel Only

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on the parties listed in the attached Service List via electronic means as listed on the Court's ECF noticing system or by regular U.S. First Class Mail on this 9th day of December, 2009.

_____*/s/ Thomas M. Farrell*_____
Thomas M. Farrell

48156